Motors Securities Company, Inc. v. Commissioner.
Motors Secs. Co. v. Commissioner
Docket No. 31656.
United States Tax Court
1952 Tax Ct. Memo LEXIS 50; 11 T.C.M. (CCH) 1074; T.C.M. (RIA) 52316; October 30, 1952
Sidney M. Cook, Esq., P.O. Box 77, Shreveport, La., for the petitioner. F. S. Gettle, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies against petitioner as follows: Year Tax
Deficiency
1944 Income
$ 8,841.76
1945 Income
38,692.49
Total
$ 47,534.25
1944 Declared-Value Excess Prof-
its
6,527.78
1945 Declared-Value Excess Prof-
its
24,774.05
Total
$ 31,301.83
1944 Excess-Profits
$ 60,760.71
1945 Excess-Profits
163,870.96
Total
$224,631.67
*51 Petitioner has also claimed an overpayment of $117,516.85 for the calendar year 1944 which is based upon the inclusion of already reported 1944 income in a settlement of petitioner's tax liability for the year 1943. The issues presented are: (1) did the difference between the price paid by petitioner to automobile dealers for motor lien time notes and the face value of such notes result from a service charge and, if so, was the income realized therefrom taxable in the year in which petitioner acquired the notes; (2) if not taxable then, was income realized at the time petitioner delivered such notes to its banks, who credited petitioner's account with the face amount of the notes and charged petitioner with interest payable monthly; (3) is the alleged partnership, Motor Discount Company, to be disregarded and the income therefrom taxed to petitioner; (4) if held a valid partnership, can respondent still allocate the same amount of income to petitioner under section 45; (5) if held a valid partnership, did petitioner realize the unearned service charges when it disposed of such notes to the partnership; (6) if petitioner did realize the unearned service charges upon transfer to the *52 partnership, would any resulting loss to petitioner be unallowable to the extent of 75 per cent thereof under the provisions of section 24 (b) (1); and (7) did petitioner make an overpayment of $117,516.85 for the year 1944. Other issues noted by the parties are mechanical in nature and can be disposed of under Rule 50. Some of the facts are stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner is a corporation organized in 1922 and domiciled at 1217 Texas Avenue, Shreveport, Louisiana. The returns for the years in question were filed with the collector for the district of Louisiana. I. From the time of its organization, petitioner has conducted a general finance business. The greater part of its business consists of buying notes from automobile dealers, while a small portion consists of buying notes direct from individuals. Petitioner solicits automobile dealers to sell to it the notes acquired by the dealers in their sales of new and used cars. These notes are secured by vendor's liens and chattel mortgages. Petitioner supplies the dealers with its own forms consisting of rate charts, retail protection agreements, buyers' statements *53 and chattel mortgages. According to the retail protection agreements, which although not signed by the dealers were delivered to some, if not all of them, petitioner undertakes to set up reserves based upon unpaid balances and periodically to rebate to the dealers the accumulated reserves in excess of 3 per cent of the then unpaid balances. The agreements also state that the dealers agree to pay petitioner a certain percentage of all reserves credited in the event petitioner "[refunds] any part of the service charge because an account is prepaid * * *". The buyers' statements give pertinent information on the car purchasers' credit standing, occupation, etc., so that petitioner can determine whether it is willing to buy the notes from the dealers. The rate charts furnish the dealers with information concerning the amount at which petitioner will purchase any given note. If petitioner approves the credit standing of the purchaser, it issues a check to the dealer for the purchase of the note at the amount shown in the rate book, such amount always representing the unpaid balance of the sales price of the automobile. In each instance the price paid is less than the face amount of *54 the note, which includes not only the unpaid balance of the sales price of the car, but also all carrying charges. The notes acquired by petitioner from the dealers bear interest from maturity only. Upon acquisition of a note, petitioner causes the security, usually a car, to be insured with a loss-payable clause to petitioner and to the customer. Petitioner then heads up a ledger sheet with the name and address of the purchaser, the dates the payments are due, and the total amount of the contract. The customer is mailed a stamped statement book showing that petitioner has purchased his note, amount and date of each payment due, total amount owed on the car, where payments are to be made, and the type of insurance by which the car is protected. An insurance policy is also mailed to the customer. After that, the customer hears no more from petitioner so long as he makes his payments within a reasonable time at petitioner's offices. A typical example of petitioner's method of carrying customers' accounts is as follows: Date
Payment
Balance
Date
Account
Amount
Due
Due
Due
Paid
No.
Paid
Mar. 1, 1945
$33.45
$401.40
Mar. 3, 1945
8,270
$ 33.45
L1
Apr. 1, 1945
33.45
367.95
Apr. 5, 1945
8,270
33.45
L2
May 1, 1945
33.45
334.50
May 3, 1945
8,270
33.45
L3
June 1, 1945
33.45
301.05
June 8, 1945
8,270
33.45
L4
July 1, 1945
33.45
267.60
June 18, 1945
8,270
258.42
L5
9.18
Aug. 1, 1945
33.45
234.15
July 11, 1945
8,270 Ref.
9.18
L6
Sept. 1, 1945
33.45
200.70
7
Oct. 1, 1945
33.45
167.25
8
Nov. 1, 1945
33.45
133.80
9
Dec. 1, 1945
33.45
100.35
10
Jan. 1, 1946
33.45
66.90
11
Feb. 1, 1946
33.45
33.45
12
*55 When petitioner acquires a note from a dealer, an account entitled "Prepaid Insurance" is set up and charged with the full amount of the premium. The insurance premium is prorated monthly over the life of the contract and monthly the amount applicable to each month is charged to an account entitled "Insurance Expense." Prior to the taxable year 1945, the amount by which the face of the note exceeded the sum of the original cost, plus the prepaid insurance and the amount set aside as "Dealer's Reserve," was credited monthly over the period of the contract to an account entitled "Deferred Service Charges" and was reported by petitioner as taxable income for the year in which it accrued such income on its books. When petitioner was first organized, its accounts were maintained on an accrual basis, and it accrued the entire income in the year in which the notes were taken. Its accounts were examined for income tax purposes in 1924 and it was required to accrue this income over the life of the note. From 1924 until about 1944 it made returns in the same manner and they were not questioned until about 1943 or 1944. Respondent proposed adjustments to petitioner's tax returns for the years *56 1940 to 1943, inclusive, proposing to include in income of each year the amount of deferred service charges set up by petitioner on notes acquired during such year. After a conference with respondent's office, petitioner entered into a settlement early in 1946, agreeing to deficiencies for the years in question. In arriving at the adjusted net income for the settled years, respondent required the inclusion of gross "service charges" in income during the year in which petitioner acquired the note, and allowed petitioner to charge off the entire amount of prepaid insurance paid by petitioner thereon. In the settlement, petitioner agreed to employ accounting principles for the years 1944 and 1945 similar to those proposed by respondent and adopted by petitioner in effecting the settlement. Petitioner transferred a good portion of its notes in 1945 to a partnership named Motor Discount Company. Petitioner's 1945 return reported a net operating loss. Since the 1944 return had already been filed at the time of settlement, petitioner filed on April 3, 1946 an amended return for 1944 which reported all of the profits that could be realized on notes acquired in 1944 but also deducted the *57 claimed net operating loss carry-back from 1945. On the same day, it filed a claim for refund for 1944 based upon the 1945 loss carry-back to 1944. On October 31, 1950, petitioner filed an additional claim for refund for the year 1944 in the amount of $117,516.85, the alleged overpayment being in issue here along with respondent's determinations. This second claim is based upon an alleged overpayment resulting from the inclusion of already reported 1944 income (from notes payable in 1944 but acquired in prior years) in the settlement of petitioner's tax liability for the year 1943. Petitioner filed its returns under an accrual method of accounting for the tax years in question. II. Prior to 1936, petitioner financed its operations through the trust departments of banks. It would take a block of notes and trustee them with the trust departments of several banks and issue collateral trust notes referring to the trust agreement. Sometime during 1936 petitioner made arrangements for rediscounting notes with three local banks in Shreveport. Under these arrangements petitioner would deliver notes to a bank and receive credit to its account for the full amount of the face value of the *58 notes shown still to be due. Petitioner could immediately draw upon the full amount thus credited. The bank made a memorandum of the notes and entered them under the asset heading "Motors Securities Company, Notes Rediscounted." The bank filed the individual notes by maturity dates and notified petitioner each day of the amount of notes maturing thereon. At the end of a 30-day period, the bank would average the daily balance of notes obtained from petitioner and levy an interest charge of 4 per cent, which petitioner paid by separate check, and which was the only source of income in these transactions to the banks. On its own records each bank carried the notes obtained from petitioner as assets, appearing under the general heading of "Loans and Discounts." Bank examiners always passed on the method of showing the notes as assets of the bank and the banks treated the notes acquired from petitioner as assets in their balance sheets. In every instance, the notes delivered to the banks bore interest only from maturity. Petitioner paid all maturities of these notes held by the banks without regard to whether petitioner had collected or not. Petitioner was required to endorse every note *59 with full recourse against it, and the banks agreed to hold the notes exclusively for petitioner and not to sell them to a third person. The makers of the notes were notified to pay at petitioner's office and were never notified of any transfer to any bank. The banks made no inquiry as to the security or value of the various notes, and the loans were not made to the makers of the notes but to petitioner. The banks did not intend to buy, nor did petitioner intend to sell these notes. Petitioner entered into the arrangement because it wanted to borrow money from the banks, and the banks considered that they were extending petitioner credit. The banks considered petitioner the owner of the notes. When petitioner repaid funds that had been advanced, it got back those notes which had been delivered to the banks for that advance. Phillips, the president of petitioner, gave his continuing guaranty to the banks not only for the direct loans to petitioner but also for the indirect loans, i.e., the rediscounts of notes acquired from petitioner. This guaranty stated that it was in consideration of the banks' granting of credit to petitioner and referred to petitioner as the debtor. At all *60 times petitioners was held primarily liable for the money advanced in this manner. If petitioner failed, the banks would have held Phillips liable and only if they both were unable to pay would they have gone against the makers of the notes. The notes were given to the banks as security for the funds advanced to petitioner and outright title was not transferred. Two of the banks which financed petitioner were national banks and the other had a self-imposed loan limit rule equivalent to the loan limits imposed on national banks. The direct loans to petitioner were limited to 10 per cent of the capital and surplus of the banks, whereas there was no limit on the indirect line of credit granted petitioner, and by the rediscounting method petitioner was extended credit considerably in excess of the 10 per cent limit imposed on direct loans. III. On March 31, 1945, an agreement to form a partnership called "Motor Discount Company" was entered into. Articles of partnership were signed and filed in the conveyance of records of Ouachita Parish on April 9, 1945. The organization was capitalized at $15,000 which was paid in cash by each of the participants. At the time of the agreement, petitioner's *61 stock ownership and the interest of petitioner's stockholders in Motor Discount Company were as follows: Percentage
Motor
Discount
Name
Shares Owned
Company
Leon J. Phillips, President
1,486 shares
25%
Mrs. Leon J. Phillips, wife of Leon J. Phillips
636 shares
None
E. F. Gullatt, Vice-president
70 shares
20%
J. Leon Dennis, Manager, Monroe office
50 shares
25%
Lynn Jennings, Secretary-Treasurer
15 shares
5%
George D. Wray, Jr.
148 3/5 shares
None
Evelyn Wray
148 3/5 shares
None
Mozelle Wray
148 3/5 shares
None
Newt Wray
148 3/5 shares
None
Chas. Wray
148 3/5 shares
None
Clyde Gray
None
5%
Mrs. Lillie Jacobs, Niece of Mrs. Leon J. Phillips
None
5%
Tom F. Truly
None
5%
Clanton Thompson
None
5%
Mrs. Lillie C. Lowrey, sister-in-law of Mrs. Leon J. Phillips
None
5%
3,000 shares
100% As shown by the above table, Phillips, Gullatt, Dennis and Jennings held together a 75 per cent interest in the partnership and with Phillips' wife owned 75 per cent of petitioner's stock. As of April 1, 1946, participants of Motor Discount Company executed an amendment to the original agreement, the effect of which was to *62 include four additional persons and to change the participation in the business. The stock ownership in petitioner had in the meantime changed so that after the amendment the stock ownership of petitioner and the percentage of participation in Motor Discount Company were as follows: Percentage
Motor
Shares
Discount
Name
Owned
Company
Leon J. Phillips
1,510 shares
25%
Mrs. Leon J. Phillips
(wife)
1,355 shares
None
E. F. Gullatt
70 shares
20%
J. Leon Dennis
50 shares
25%
Lynn Jennings
15 shares
2%
Clyde Gray
None
5%
Tom F. Truly
None
5%
Mrs. Lillie Jacobs
None
2%
Mrs. Lillie C. Lowrey
None
5%
J. S. Harbuck
None
5%
Lexton Hyatt
None
5%
Clanton Thompson
None
2%
Lottie Pearson
None
2%
Ralph McCrary
None
2%
3,000 shares
100% Gray, Truly, Mrs. Jacobs, Harbuck, Hyatt, Thompson, Pearson and McCrary were all employees of petitioner. Motor Discount Company had two employees during the second quarter of the fiscal year ending March 31, 1946. During the third quarter of the same fiscal year, it had five employees. During the fourth quarter, it had seven and, during the first quarter of the fiscal year ending March 31, 1947, it *63 had six employees. Salaries and profits reported by employees and shareholders of petitioner, and employees and partners of Motor Discount Company were as follows: Motors
Motor
Securities
Discount
Year
Company, Inc.
Company
1943
$60,103.03
1944
64,957.50
1945
72,903.50
$ 10,976.50
1946
51,997.60
224,653.19
1947
65,475.00
149,362.77 The figures for petitioner represent salaries only. Petitioner did not declare any dividends. The figures for Motor Discount Company represent both salaries and distributable profits to the partners. Between May and December 1945, petitioner transferred to Motor Discount Company notes of a face amount of $3,136,127.39 and a book value of $2,637,386.12 for a consideration of $2,673,167.33, which was their fair market value. The book value was determined by deducting the deferred service charges and the unearned reserve from the sum of the prepaid insurance and the face amount of the notes. Motor Discount Company collected on these notes nanced its operations with the banks under the same kind of arrangement petitioner had. Except for purchases made from a dealer in El Dorado, Arkansas, Motor Discount Company purchased *64 all of its motor lien notes from petitioner. When these notes were purchased, they were paid for by check of Motor Discount Company. The partners constituting Motor Discount Company paid income taxes upon the profits which they realized from its operations, and from time to time they drew against their earnings from Motor Discount Company. Motor Discount Company paid Social Security taxes on its employees. Separate records were kept for Motor Discount Company. Its books consisted of a general ledger, a cash book, a check register, and a general journal. It had its own telephone listing although its phone was on petitioner's line. Motor Discount Company and petitioner maintained joint offices in both Shreveport and Monroe, Louisiana. In Shreveport, petitioner had one large office and 12 smaller offices. Part of the large office and one of the smaller offices were used by Motor Discount Company. Many of the employees and officers of petitioner were both employees and partners of Motor Discount Company. The common operating expenses of the two organizations were prorated for the most part according to the value of the notes owned by each during a particular period. This method of *65 allocation was applied to the telephone and electric bills and to the salaries of employees who performed services for both organizations. Rent was prorated on the basis of floor space occupied by each. Motor Discount Company paid the entire salaries of employees who performed services solely for the Discount Company. Each organization had separate collectors for collection of delinquent accounts. Notes of customers were also paid over a counter in the main offices to cashiers whose salaries were prorated between the two companies. The partnership information return, Form 1065, for its first fiscal year ended March 31, 1946, reports ordinary net income of $201,359.81, whereas the 1945 calendar year return for petitioner disclosed a loss of $93,425.04. Motor Discount Company reported its income in the same manner that petitioner reported its income prior to the settlement in 1946, namely, by reporting accruals of income pro rata as installments became due on notes acquired. The balance sheet attached to petitioner's tax return shows no unearned service charges on December 31, 1945, whereas Motor Discount Company had $337,779.28 of unearned service charges on that date and had been *66 in existence only since April 1, 1945. Petitioner rediscounted notes in the amount of $1,192,087.44 with the three banks during 1945, whereas Motor Discount Company rediscounted notes totaling $2,664,010.24 during that same year. By his deficiency notice, respondent determined that Motor Discount Company was not a valid partnership within the provisions of the internal revenue laws and attributed the disclosed income of said company, amounting to $408,313.25 for the period ending December 31, 1945, to petitioner. Respondent arrived at this figure in the following manner: Net income per books for period
ended Dec. 31, 1945
$100,945.74
Additions: Deferred service charges at close
of year
337,779.28
Salary of "partners"
36,000.00
$474,725.02
Deductions: Prepaid insurance at close of
year
66,411.77
Adjusted income Motor Discount
Company
$408,313.25
Opinion This is another in the constantly expanding group of cases in which a taxpayer's long-established and consistent accounting system is being attacked by respondent. As in many of those cases, justification for the criticism seems doubtful, Commissioner v. Schock, Gusmer & Co. (C.A. 3), 137 Fed. (2d) 750; *67 Atlantic Coast Line Railroad Co., 4 T.C. 140; cf. Pacific Grape Products Co., 17 T.C. 1097, and in fact, in some, what originated as an effort to protect the revenue completed its course with a loss for the Treasury instead of a gain. Heer-Andres Investment Co., 17 T.C. 786; Robert G. Frame, 16 T.C. 600. From 1924 until 1943, petitioner's method of recording the income from the commercial paper it acquired was uniformly set up on its books and reported for tax purposes. The system used was an accrual method of allocating the prospective installment receipts over the life of the notes as the amounts became due, with certain reserves not here material, and of reporting the proportionate amount in the applicable year as ordinary income. [1] In 1944, petitioner's returns for 1940 and subsequent years were audited and only later, at respondent's insistence, was the system changed so that the entire amount would be accrued upon the receipt of the note. Petitioner now resists the similar procedure proposed by respondent for 1944 and 1945.
*68 Petitioner's system of accrual accounting appears to have been designed to record the installments as they periodically became due. Only if that system distorted its income are we prepared to sustain respondent's action in destroying it. Whether the system is permissible is presented by the parties as though it turned upon the nomenclature to be applied to the transaction, respondent insisting that the entire proceeds was a service charge, Elk Discount Corporation, 4 T.C. 196; Columbia State Savings Bank, 15 B.T.A. 219, aff'd (C.A. 7) 41 Fed. (2d) 923, and petitioner that it was a discount. Chatham & Phenix National Bank, 1 B.T.A. 460Chicago Acceptance Co., 12 B.T.A. 150. Resolution of the issue can be simplified by rephrasing the problem as stated by the parties. The question is not so much whether the reduction below face at which the notes were purchased by petitioner was, on the one hand, "discount" or "interest" or, on the other, a "service charge" or "commission," see S.M. 3820, IV-2 C.B. 32, and G.C.M. 14839, XIV C.B. 73, but whether the familiar rule of accrual that the time of receipt is *69 when the fact and amount of income become reasonably ascertainable renders these amounts accruable when the notes were acquired or at some subsequent date. It is true that the interest or discount approach is employed to describe an arrangement whereby the amount to be received is uncertain and depends upon the length of the period for which the money was borrowed. The rule has hence become established that such items are accruable only as time passes and the interest has become earned. Chatham & Phenix National Bank, supra; Madison & Kedzie State Bank, 1 B.T.A. 922. But it would be perfectly possible for a discounted loan to carry a fixed interest figure regardless of repayment; and we take it that it would be equally possible for an item denominated service charge to depend for its magnitude upon the nature, extent, or duration of the service. See Lindstedt-Hoffman Co., 11 T.C. 584. It hence seems preferable to discard labels in dealing with the present problem and to dispose of the question on the familiar theories thus outlined. If, then, the amount to be received by petitioner was definitely fixed and reasonably ascertainable at *70 the time the notes were acquired, accrual concepts might compel treatment of the entire proceeds as income at that time. If, on the other hand, however designated, the amount to be received might vary, only the time when its receipt became reasonably certain would justify its accrual as income. There is no question here of treating the proceeds of the notes as capital gain, see Western Acceptance Corp., 46 B.T.A. 828, nor in fact of petitioner's status as a personal holding company because of its receipt of income consisting of interest. Noteman v. Welch (C.A. 1), 108 Fed. (2d) 206. If, as respondent insists, the income resulted from a service charge, it was a service which covered the entire life of the paper, including, as the record shows, requirements of receipt and collection of the installments due. See Linstedt-Hoffman Co., supra.It would accordingly more clearly reflect income even on that approach for the payments to correspond to the expenses of acquisition and collection as the life of the note proceeded to its end. Southern Abstract & Loan Co. v. Commissioner (C.A. 6), 72 Fed. (2d) 130; cf. Columbia State Savings Bank, 31 B.T.A. 685. *71 But in fact - although the record is obscure and the information obtainable only by careful and minute examination of the accounting documents [2] - respondent's own theory [3] for accruability on receipt appears to be inapplicable. *72 The possibility that prepayment would carry with it a reduction in the discount which, as we have said, respondent regards as the criterion [4] is evident from the document customarily delivered by petitioner to the original holders of the notes. [5] And one of the accounts said to be typical demonstrates an entry upon prepayment designated "ref." and apparently treated as a refund or reduction of the amount due. In addition, against the same face amount of the notes, which respondent insists in his first point represented in its excess over the amount paid the immediately earned income from the notes, there was established a so-called "Dealer Reserve." The same agreement with the dealer included a provision that "Three times in each 12-months' period if we [the dealer] are not then indebted to you [the petitioner], you will pay us our accumulated reserves in excess of 3 per cent of the then aggregate unpaid balances on paper purchased from us * * *." *73 Under all the circumstances we conclude that there was no failure of petitioner's long-continued and consistent bookkeeping method to reflect accurately its income and that its accounting system need not be disturbed. One precautionary word should be said about a detail of the 1945 tax liability. Since the so-called settlement of the 1940 to 1943 controversy was not arrived at until some time in 1946, it does not appear that the 1945 return prepared and filed in 1946 followed petitioner's consistently employed accounting practice perhaps because of a reconstruction to reflect the method proposed by respondent. [6] If petitioner failed to report in 1945 collections on notes acquired, for example, in 1944 - a clear possibility since the notes ran for a 12 to 24-month term - its 1945 income would be distorted to the extent that such collections would be unreported for any year. To that extent an adjustment should be made using figures which presumably can be agreed upon in the Rule 50 computation. *74 The second issue involves a simple question of fact. It was petitioner's practice to obtain funds from banks and in that connection to turn over the motor lien notes. The controversy is whether, by these transactions, the notes were sold to the banks so that at that time, if not before, petitioner realized the total remaining income from the notes, or whether the transactions were merely loans with the notes delivered to the banks as collateral. We have resolved this matter by our finding of fact that the payments by the bank were no more than advances for which petitioner at all times remained liable, and for which in fact its president assumed additional responsibility as guarantor; and that the notes were merely security with the equivalent of title remaining at all times in petitioner. United National Corporation, 33 B.T.A. 790; E. C. Gatlin, 34 B.T.A. 50. The third question is considerably more complicated. Respondent urges us to treat as non-existent a partnership organized by some of petitioner's stockholders and employees and their relatives to which some of the notes were ultimately transferred and to treat the partnership income as in fact *75 that of petitioner. This we are unable to do. The partnership was a fully functioning, independent entity engaged in the active transaction of business. Its operations were in all respects severable from those of petitioner; its liabilities to the banks, similar to those discussed in connection with the preceding point, were its obligations and those of its partners and not to any extent petitioner's obligations; and it does not present, as in some other cases, the problem of whether or not it performed a service for petitioner in payment for which the latter is entitled to a deduction. See, e.g., Louis Adler Realty Co., 6 T.C. 778, appeal dismissed (C.A. 2) June 19, 1947; National Contracting Co., 37 B.T.A. 689, affd. (C.A. 8) 105 Fed. (2d) 488; Grenada Industries, Inc., 17 T.C. 231. The connection between them ended when the partnership purchased and petitioner sold the notes in question. We conclude that the partnership income may not be considered as belonging to petitioner. Coca-Cola Bottling Co. of Sacramento, 17 T.C. 101; Chelsea Products, Inc., 16 T.C. 840; Buffalo Meter Co., 10 T.C. 83; *76 Ross v. Commissioner, (C.A. 5) 129 Fed. (2d) 310. Related both to the contention and its disposition is respondent's alternative proposition that under section 45 the income of the partnership can be allocated to petitioner. Without engaging in an extended discussion of the intricacies of the application of section 45, see, e.g., Chelsea Products, Inc., supra, it suffices to dispose of this phase of the controversy by pointing out that respondent has several times conceded that the notes were transferred for their full fair market value. That his argument is inconsistent with that concession appears, among other things, from the necessity under which he appears to be proceeding of making such statements in his brief as "The reported consideration for the notes was completely inadequate to evidence a bona fide sale" and it "can be said with all certainty that the petitioner corporation would not have disposed of the notes to outsiders at the price it allegedly sold them to the Motor Discount Company," the partnership. We view these statements as inadmissible in the light of the concession to which we have alluded, made several times at the hearing, as for *77 example in response to the question, "You are not raising any question that they didn't get full value for the notes when they were transferred to the partnership?" and by the answer that "There is no question raised on either side as to the value of the notes." (Italics added) There were in fact joint employees of petitioner and the partnership and commingled expenses in other respects such as rent, telephone, and the like. But the parties themselves allocated these expenses by a method which seems not unreasonable and is in fact not now opposed by respondent. It follows that there is no basis by which the provisions of section 45 may be resorted to in aid of respondent's position. Miles-Conley Co., 10 T.C. 754, affd., other issue, (C.A. 4) 173 Fed. (2d) 958; Koppers Co., 2 T.C. 152; Welworth Realty Co., 40 B.T.A. 97, 101. Cf. G.U.R. Co., 41 B.T.A. 223, affd. (C.A. 7) 117 Fed. (2d) 187. There is some further suggestion that respondent regards the transfer to the partnership in any event as a realization of the unearned income on the notes. Petitioner reported the total amount received from the *78 partnership in computing its gain and, since this was admittedly the then value of the notes, it seems impossible to treat this view as basically different from respondent's original contention that the income was earned at the time the notes were acquired. What we have said on the first point and on the issue as to the partnership income disposes of this question also. A further hypothesis advanced by respondent that any loss suffered by petitioner on the transfer of the notes to the partnership would be unallowable under section 24(b), Internal Revenue Code, need not be further noted. It is not an issue in the light of our disposition of the other questions. On these phases of the case, accordingly, we view the determination as erroneous. A final question appears to be implicit in petitioner's claim for refund in the amount of $117,516.85, which it continues to press as though its disposition would follow the treatment of the deficiencies. [7] To this we are unable to agree. Even assuming that the claim was not filed too late [8], its theory seems to us inconsistent with petitioner's position on the primary issue. The claim arises because of petitioner's *79 agreement to a settlement of its tax claims for 1940 through 1943 along the accounting lines insisted upon by respondent. But these years are not before us. Having assented to a computation of its tax for these earlier years that incorporates the full future earnings of the notes in the years of their acquisition, petitioner now claims that in 1944 it overpaid its tax by having included the receipts from the notes acquired in the earlier years as such receipts became due. But assuming that we are correct in our disposition of the primary issue and that petitioner's continuous and consistent accounting treatment was proper, whatever error there was consisted in petitioner's agreement for the years 1940 to 1943. There was no overpayment for the year 1944. And any miscalculation of the amounts due would be attributable to the prior years over which, as we have said, we have no jurisdiction. If the claim for refund representing the overpayment was acted on, which is by no means clear, we accordingly think it was properly denied. No other items remain for which an adjustment cannot be made under the recomputation. *80 Decision will be entered under Rule 50. Footnotes
1. Respondent's attempt to label petitioner's system as installment accounting is wide of the mark. The installment system is a cash method dealing with "payments actually received." Internal Revenue Code section 44 (a); see Iowa Guarantee Mortgage Corp., 28 B.T.A. 213 [Dec. 8082], affd. (C.A. 8), 73 Fed. (2d) 217↩ [1934 CCH [*$ 9479]. The question here is not what part of petitioner's receipts should be taken up in income upon their receipt in cash as it would be under installment accounting, but whether under an accrual system they should be accrued when the notes were first acquired or as the respective installments became due.
2. Notwithstanding that the facts are intricate and the applicable legal and accounting theories complicated, the presentation both of the facts at the hearing and the law on brief by the parties has unnecessarily added to the difficulties of disposition of the case and to the time required to analyze the issues and give them adequate consideration. ↩
3. The central fallacy of respondent's position cannot be better illustrated than by quoting verbatim the heading of the first point in his brief: "The transaction in which the petitioner exchanged money for motor lien notes gave rise to a profit which is recognized as income in the year in which such transaction occurred measured by the amount by which the fair market value of the notes received, which is the face amount of the notes, is in excess of the money exchanged therefor." [Italics added.] Even assuming that notes of heterogeneous automobile purchasers were so unquestionably collectible that their future payment was completely assured, this statement that fair market value equalled face (which included all carrying charges payable over the life of the note) would be demonstrably incorrect if for no other reason than because the present value of a dollar payable in 12 to 24 months cannot possibly be the entire dollar. Regulations 105, section 81.10 (j) (Table B); Regulations 108, section 86.19(j) (Table B).↩
4. "* * * The principle involved is essentially no different than that of bank discount, wherein we have several times held that discount neither received nor accrued within a taxable year is not income subject to tax in that year. * * *" [Chicago Acceptance Co., 12 B.T.A. 150, 152↩ [Dec. 4006]] 5. Retail protection agreement, quoted in our findings.↩
6. The deficiency notice, however, contains the statement that "It is held that the income realized by your corporation as the result of profits earned on purchased motor lien time notes does not constitute interest or discount, and therefore may not be amortized over the life of the conditional sales contracts. Accordingly, the deferred service charges at the close of the respective taxable years ended December 31, 1944 and 1945 have been restored to taxable income." (Italics added.)↩
7. Petitioner does not regard it as a separate issue: "Mr. Cook [petitioner's counsel]: * * * and then, as I said, the question of the refund for overpayment in 1944, offset by the deficiency in 1945. "The Court: Well, does that incorporate an additional issue, or is that just a result - "Mr. Cook: I think that will be a result of the findings in these other issues. "The Court: If it isn't what other issue is involved? "Mr. Cook: None, I think. * * *." ↩
8. The claim states on its face that "The time within which this claim may be legally filed expires under section 322 of Internal Revenue Code↩ on June 30, 1950." Yet the stamps likewise appearing on the claim show "Registered Mail, received Oct. 24, 1950" and "Collector's Stamp, Date Received * * * Oct. 24, 1950."