**NATIONAL LEAD COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 410, Docket 28586.**

United States Court of Appeals
Second Circuit.

Argued May 14, 1964.

Decided Sept. 1, 1964.

---

Karl Riemer, Washington, D. C. (Pehle, Mann, Riemer & Luxford, Washington, D. C., of counsel), for petitioner.

Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before KAUFMAN, HAYS and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

This petition for review of the Tax Court presents three issues relating to petitioner's income tax liability for the year 1952. The first is whether it validly revoked an election to use the "LIFO" inventory replacement provisions of section 22(d)(6)(F) of the Internal Revenue Code of 1939; the second is whether it may deduct as a loss the repayment by a British subsidiary of an outstanding debt which arose out of petitioner's sale of stock to the subsidiary in 1937, where the subsidiary repaid in devalued British currency; the third is whether petitioner is taxable on dividends received by the subsidiary on the transferred stock and on the gain realized by the subsidiary when it sold some of the stock.

### I. *The Revocation Issue*

■ On its income tax return for 1950, the taxpayer used the LIFO (Last-In, First-Out) method of valuing its inventories of zinc, copper and red metals. We explained this accounting convention in R. H. Macy & Co. v. United States, 2 Cir., 255 F.2d 884, cert. denied, 358 U.S. 880, 79 S.Ct. 119, 3 L.Ed.2d 110, as follows:

"Under any method of inventory, 'costing' the closing inventory is a necessary step in the calculation of taxable income. FIFO and LIFO are alternative accounting methods for arriving at this cost. LIFO assumes that the last articles purchased during the year were the first ones sold, so that articles left in the inventory at the end of the year were the first ones purchased. FIFO (first-in, first-out) assumes the converse, that the earliest article purchased was the first one sold, so that articles left in the inventory at the end of the year were the last ones purchased. Obviously neither FIFO nor LIFO corresponds with actual fact, although the FIFO assumption seems more logical in the normal course of business operations. In a period of stable prices the application of either theory renders the same result. But during an inflationary period, LIFO is distinctly advantageous to the taxpayer, for, in effect, he is not required to include as profit increases in value of inventory. This illustrates the real purpose of the methods—to reflect accurately what normally is considered as profit during inflationary and deflationary periods in the economy."

The underlying assumption of the LIFO method is that businessmen are always able to purchase enough goods to maintain their inventories at a relatively stable level. The method permits the increase in prices of articles purchased during an inflationary period to be allocated to cost, rather than profits. However, during a period of scarcity, it may not always be possible to replace inventories. As a result, the so-called base-stock inventory will be depleted, and the cost of goods sold will represent, not current market prices, but the prices prevailing in previous years, normally lower. This, accountants contend, tends to inflate profits above what they realistically are. More important, in the absence of special provisions in the tax law, the cost of bringing inventory up to normal when it becomes possible to do so would not be deductible as an expense for income tax purposes.

Congress granted relief to taxpayers in this situation in 1942, when the problem of involuntary inventory liquidation had become acute as a result of World War II. Revenue Act of 1942, 56 Stat. 814, which added section 22(d)(6) to the Internal Revenue Code of 1939. This provision as amended, applies to liquidations occurring in taxable years beginning after December 31, 1940 and prior to January 1, 1948. Subsequently, a similar provision was added for taxable years ending after June 30, 1950 and prior to January 1, 1954, by the Act of January 11, 1951, 64 Stat. 1244. Section 22(d)(6)(F). This provision, at issue here, is set out in the footnote.[1]

Briefly, the statute provides that in cases where taxpayers can establish that a liquidation of inventory has occurred due to specified circumstances beyond their control, and that in a subsequent year they replace the inventory, they may elect to adjust their net income for the year of liquidation by deducting from it the excess of the cost of goods replaced over the cost of the goods liquidated. Once the adjustment is made, taxes for the year of liquidation, the year of replacement, and all intervening and subsequent years must be redetermined accordingly.

Section 22(d)(6)(D), applicable to transactions under section 22(d)(6)(F), provides that

"An election by the taxpayer to have the provisions of this paragraph apply, once made, shall be irrevocable and shall be binding for

---

1. *"Adjustment of net income and resulting tax.*—If, for any taxable year ending after June 30, 1950, and prior to January 1, 1954, the closing inventory of a taxpayer inventorying goods under the method provided in this subsection reflects a decrease from the opening inventory of such goods for such year, and if the taxpayer elects, at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe, to have the provisions of this paragraph apply, and if it is established to the satisfaction of the Commissioner, in accordance with such regulations, that such decrease is attributable to the involuntary liquidation of such inventory as defined in subparagraph (B) (as modified by clause (ii) of this subparagraph), and if the closing inventory of a subsequent taxable year, ending prior to January 1, 1956, reflects a replacement, in whole or in part, of the goods so previously liquidated, the net income of the taxpayer otherwise determined for the year of such involuntary liquidations shall be increased by an amount equal to the excess, if any, of the aggregate cost of such goods reflected in the opening inventory of the year of involuntary liquidation over the aggregate replacement cost, or decreased by an amount equal to the excess, if any, of the aggregate replacement cost of such goods over the aggregate cost thereof reflected in the opening inventory of the year of the involuntary liquidation. The taxes imposed by this chapter and by chapter 2 for the year of such liquidation, for preceding taxable years, and for all taxable years intervening between the year of liquidation and the year of replacement shall be redetermined, giving effect to such adjustments. Any increase in such taxes resulting from such adjustments shall be assessed and collected as a deficiency but without interest, and any overpayment so resulting shall be credited or refunded to the taxpayer without interest."

the year of the involuntary liquidation and for all determinations for prior and subsequent taxable years insofar as they are related to the year of liquidation or replacement."

The present controversy arises over the taxpayer's contention that section 22 (d)(6)(D) is subject to an implied exception, where a notice of revocation of election to use section 22(d)(6)(F) is filed prior to the time set by the regulations for making the election. Although the Tax Court rejected this claim, we find merit in it, in the circumstances presented here, and accordingly reverse the judgment on this issue.

Section 22(d)(6)(F) was added to the Code by the Act of January 11, 1951, ch. 1227, 64 Stat. 1244. On September 22, 1952, the Commissioner, pursuant to that statute, issued an amendment to Regulations 111, conforming to the new statute. T.D. 5932, 1952–2 Cum.Bull. 76. Under these regulations, a taxpayer's election to have section 22(d)(6)(F) apply, with respect to years of liquidation ending after June 30, 1950 and before March 1, 1952 might be made at any time up to December 15, 1952. On March 4, 1952, before adoption of these regulations, the taxpayer had sent a registered letter to the Commissioner, notifying him of its election to invoke the new statutory provisions with respect to involuntary liquidation, during the taxable year 1950, of its inventories of zinc, copper and other red metals. The letter also stated that the taxpayer had made every reasonable effort to maintain its base stock inventory of these materials, but that prevailing conditions were such as to make this impossible.

On December 12, 1952, taxpayer sent a registered letter to the Commissioner revoking its election with respect to the zinc inventory and confirming it with respect to the other two metals. It took this step, according to the testimony of its officers, because changes in the available supply of zinc made it economically advantageous to do so. The Commissioner refused to accept the revocation, and

required taxpayer to abide by its March election, assessing a substantial deficiency on the 1952 tax return.

It is always a difficult matter to give the words used in statutes, especially such strong language as that contained in section 22(d)(6)(D), anything other than their most natural and commonly accepted meaning. On the other hand, we are confident that the purpose of that provision was to ensure that, once a final election was made, subsequent events would not permit a taxpayer to change it and possibly distort its tax liability for succeeding years, as would be the case if the election were exercised for some but not all years. This danger is not present in this case, since the taxpayer notified the Commissioner, within the period set by his own Regulations, of its final position with respect to its exercise of the option given it by Congress. In no way could the revenue be prejudiced by a decision, on these facts, to allow the taxpayer to revoke its election. It is also noteworthy that the Regulations which existed at the time taxpayer made its initial election, required taxpayers who desired to elect to employ section 22(d)(6)(A), to take action within six months following their filing of an income tax return for the year of liquidation. There could be no certainty at that time that, when the Regulations were finally changed to reflect the new statute, any longer period of time would be granted. The taxpayer's initial election was made five months and 20 days after it filed its tax return for 1950.

We believe that the Supreme Court's decision in Haggar Co. v. Helvering, 308 U.S. 389, 60 S.Ct. 337, 84 L.Ed. 340 (1940) provides a close parallel to the instant case. That case involved the "capital stock" and "declared value excess profits" taxes imposed on corporations by section 215 of the National Industrial Recovery Act of 1933. The statute required corporations to file a declaration of capital stock value, which might be set at any figure, and pay an annual tax at the rate of $1 for each $1,000 of declared value. An additional tax was

imposed with respect to corporate income which exceeded 12½% of the declared value of the capital stock.

Section 215(f) of the Act stated that "the adjusted declared value shall be the value, as declared by the corporation in its first return under this section (which declaration of value cannot be amended) * * *." The Haggar Company, a Texas corporation, filed its tax return for the year ending June 30, 1933 in August 1933, and under the belief that it was required to use the par value of its stock for purposes of the declared value tax, declared a value of $120,000. It was later better advised and, before the final date for filing returns for that year, filed an amended return declaring a higher value. The Commissioner, relying on the literal language of the statute, refused to accept the amended declaration of value. His position was sustained by the Board of Tax Appeals (38 B.T.A. 141) and the Circuit Court of Appeals for the Fifth Circuit (104 F.2d 24 (1939)), but the Supreme Court unanimously reversed. In an opinion by Mr. Justice Stone, the Court stated that "to construe 'first return' as meaning the first paper filed as a return, as distinguished from the paper containing a timely amendment, which, when filed is commonly known as the return for the year for which it is filed, is to defeat the purposes of the statute by dissociating the phrase from its context and from the legislative purpose in violation of the most elementary principles of statutory construction." 308 U.S. at 395, 60 S.Ct. at 340.

The Court also noted that the purpose of the statute was to allow the taxpayer to fix for itself the value of its capital stock, provided that this value must be adopted for all subsequent years, thus avoiding the necessity of a complicated formula to determine actual value. At the same time, understatements of value were discouraged through the excess profits tax device. The Court emphasized that "It is plain that none of the purposes would have been thwarted and no interest of the Government would have been harmed had the Commissioner, in conformity to established departmental practice, accepted the petitioner's amended declaration. It is equally plain that by its rejection petitioner has been denied an opportunity to make a declaration of capital stock value which it was the obvious purpose of the statute to give, and that denial is for no other reason than that the declaration appeared in an amended instead of an unamended return. We think that the words of the statute, fairly read in the light of the purpose, disclosed by its own terms, require no such harsh and incongruous result." Id. at 394–395, 60 S.Ct. at 340.

The Government attempts to distinguish Haggar from the instant case by noting that the taxpayer there was under a mistake of fact when it filed its original return, whereas here the taxpayer changed its position as a result of changes in market conditions between March and December 1952. It also stresses the fact that the statutory provision under consideration in Haggar did not require an election on the part of the taxpayer. However, in J. E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 61 S. Ct. 95, 85 L.Ed. 36 (1940), the Court stated that "Haggar Co. v. Helvering * * * would compel the conclusion that had the amended return been filed within the period allowed for filing the original return, it would have been a 'first return' within the meaning of § 114(b) (4)" of the Revenue Act of 1934, ch. 277, 48 Stat. 680. That section provided for a taxpayer's election to use the percentage depletion method, and required the taxpayer to abide by his initial election during all succeeding years. The taxpayer, which did not learn of the new section until many months after it filed its tax return for the calendar year 1934, attempted to make the election in an amended return filed long after the deadline. Had the amended return been timely filed, it seems clear from the above quotation that the decision would have gone in its favor.

We believe that the Haggar and Riley cases suffice to demonstrate the correctness of the present taxpayer's position.

As in Haggar, the purpose of the relevant statute—here even more clearly to benefit the taxpayer—is furthered by acceptance of the amended election; as in Haggar, the government is in no way disadvantaged thereby since the final election was made within the time specified by law. None of the cases cited to us by the government, such as R. H. Macy & Co. v. United States, supra; Aeolian Co. of Missouri v. United States, 257 F.2d 24 (8 Cir. 1958); Rosenfield v. United States, 156 F.Supp. 780 (E.D.Pa.1957), aff'd, 254 F.2d 940 (3 Cir. 1958); cert. denied, 358 U.S. 833, 79 S.Ct. 55, 3 L.Ed. 2d 71 (1958); and Raymond v. United States, 269 F.2d 181 (6 Cir. 1959) stand for the contrary proposition, since in all those cases the taxpayers attempted to revoke elections well after the period allowed for making them. We can see no reason for denying taxpayers the benefit of a *locus poenitentiae* specifically given them by statute or appropriate regulation.

## II. *The "Hoyt Metal" Issues*

The second and third issues in this case present interesting variations of a single theme: what consequences flow from the sale of property to a wholly-owned subsidiary, the loss on which sale is not deductible under the rule of Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940); Crown Cork Int'l Co., 4 T.C. 19 (1944), aff'd, 149 F.2d 968 (3 Cir. 1945); and Bank of America N. T. & S. A., 15 T.C. 544, aff'd, 193 F.2d 178 (9 Cir. 1951). This question has, to our knowledge, not been presented to an appellate court heretofore.

Briefly stated, in 1937 the petitioner sold certain shares of the Goodlass Wall and Lead Industries, Ltd., a British corporation, to its wholly-owned subsidiary, a British corporation named Hoyt Metal Co. of Great Britian, Ltd. The sale was made at petitioner's instance and request, and primarily was intended to secure a capital loss for that year, which would offset capital gains on the sales of other stock. The sale price was the current market value of the Goodlass shares on the London Stock Exchange, and amounted to £257,884 11s., which at the prevailing rate of exchange in 1937 equalled $1,288,938.56. Hoyt set up the purchase price on its books as a sterling debt to petitioner, while petitioner set it up on its books as an account receivable of $1,288,938.56. At the time, Hoyt had resources in no way sufficient to make payment for shares. The petitioner claimed a loss of $389,051.19 on its 1937 tax return, a figure which the Commissioner allowed. It is not disputed that, under the cases cited above, such deduction would have been disallowed had the Commissioner taken action.

During the next fourteen years, Hoyt held the stock in its own portfolio and received substantial dividends from Goodlass. During most of those years, Hoyt declared and paid dividends to petitioner; the amount of these dividends bore no particular relationship to the dividends Hoyt received on the Goodlass shares. In the same period, Hoyt earned profits of between roughly £6,200 and £29,300 annually from its other operations. In addition to the debt arising out of the stock sale, Hoyt was also liable to petitioner for dividends declared but not paid in previous years, for a total indebtedness of £279,867–6–4. In 1938, 1939, and 1940, Hoyt reduced this debt by payments to £229,063–13–0. Except for an adjustment of a few hundred pounds, this figure remained unchanged through 1951. On December 31, 1951, the dollar debt on petitioner's books stood at $1,153,823.93.

During the year 1952, petitioner purchased for its own account, through the London office of the Guaranty Trust Co. of New York, British bonds in the sum of £228,612–17–9—the exact amount of Hoyt's sterling indebtedness. In the same period, Hoyt sold on the London exchange 243,350 shares of Goodlass, for a total consideration of £228,707–3–10. It remitted nearly all of the proceeds (except for the difference of £94–6–1) to the Guaranty Trust Co. office, and as it did so, both it and petitioner gradually reduced the outstanding debt to the van-

ishing point. It is clear from the record that Hoyt Metals made these sales in order to afford its parent the sterling necessary to pay for the bonds. In other words, like the 1937 transaction, the 1952 sale was at petitioner's instance and request, and in furtherance of its own corporate purposes.[2]

At the time of the 1952 transaction, the equivalent of the sterling debt was $585,068.29, owing to the devaluation of the pound. National Lead claimed the difference between this figure and $1,153,-823.93, to wit, $568,755.64, as an ordinary loss. The Commissioner disallowed it on audit of the return.

At the same time, the Commissioner determined that National Lead realized gain on Hoyt's disposition of 40,000 shares of Goodlass stock which it sold on the open market in 1951, and on the disposition of the 243,350 shares of stock in 1952. The gain was figured by subtracting from the dollar equivalent of the sales price, the basis of the stock in petitioner's hands in 1937, less the amount taken as a deduction at that time and giving effect to a 2–1 stock split which Goodlass made in September 1951[3]. He also charged petitioner with the sum of $113,649.72 representing the 1952 dividend paid Hoyt by Goodlass. These adjustments were all made on the theory that, as the 1937 sale should be disregarded for tax purposes, ownership of the Goodlass stock never left petitioner and the corporate entity of Hoyt should be disregarded in connection with the Goodlass stock.

Petitioner's arguments in favor of its currency exchange deduction boil down to a contention that, whatever the merits of the 1937 transaction may be, it was at least effective to create a valid debt between itself and Hoyt, upon whose satisfaction in depreciated pounds a loss was sustained. It charges the Commissioner with attacking valid transactions for no other purposes than that they had a tax-inspired motive, and buttresses its argument with such taxpayer-favored cases as Chisholm v. Commissioner, 79 F. 2d 14 (2 Cir. 1935); Loewi v. Ryan, 229 F.2d 627 (2 Cir. 1956); Granite Trust Co. v. United States, 238 F.2d 670 (1 Cir. 1956); and Sun Properties Inc. v. United States, 220 F.2d 171 (5 Cir. 1955). At the same time, it does not challenge the Tax Court's basic assumption that, under Higgins v. Smith, supra, the 1937 transaction was vulnerable to attack even though the Commissioner forbore at the time.

Economically, of course, the taxpayer's argument is totally unjustified. In December 1937, it owned shares with a basis of $1,677,870. Disregarding the purported transfer, it disposed of about 29 percent of this stock in 1952, having a basis of about $485,000,[4] for a consideration of $505,490. The net effect, when the transactions in this portion of the Goodlass stock were realistically closed, was a profit, not a loss. Yet taxpayer not only has already recognized a loss of $389,000 in 1937, but it now seeks to have recognized another paper loss of nearly half a million dollars. This argument cannot be permitted to prevail. We think the record clearly sustains the Tax Court's conclusion that "the petitioner did, in fact, exercise substantial domination and control over the subsidiary with respect to the relationship between them in respect to the Goodlass stock."[5] Although the books of the companies reflected a debt outstanding between Hoyt and the petitioner from the 1937 transaction until the 1952 "repayment," it

2. After purchasing the British bonds, petitioner exchanged them for West German deutschemarks, which it used to enable another wholly-owned subsidiary to purchase full stock ownership of a German manufacturing concern.

3. The gain on the 1951 sale is relevant to this proceeding only insofar as it reduces the capital loss carryover available to petitioner in 1952.

4. This figure does not reflect the reduction in basis caused by the sale at a loss in 1937.

5. 40 T.C. 282, 299 (1963).

seems clear that, first, the original sale was at the sole instigation of the parent; second, that the subsidiary was in no position to satisfy the 1937 debt at the time of the sale or for a long period thereafter; third, that the account was allowed to remain dormant for a long period of time; and fourth, that the eventual "repayment" was done to facilitate the parent's financing of another transaction with third parties. It could thus properly be found, as the Tax Court did find, not only that there was no arm's length deal between the parties, but also that the transaction was not one that would be entered into by parties dealing at arm's length. Cf. Nassau Lens Co. v. Commissioner, 308 F.2d 39, 45–46 (2 Cir. 1962).

On the surface, this case does not involve a loss deduction arising out of the sale of stock, but rather a currency exchange loss. However, petitioner would be entitled to this loss only if the debt owed to it by Hoyt is found to be valid and recognizable for tax purposes—or, in other words, if it is found to have economic substance. The mere fact that the initial transaction which gave rise to the debt was recognized in 1937 does not prevent the Commissioner from attacking its validity now.

We are convinced that Higgins v. Smith, supra, which would obviously bar recognition of the 1937 loss if that question were open, operates with equal force with respect to the 1952 transaction. The Court there observed that "[t]here is not enough of substance in such a sale finally to determine a loss," 308 U.S. at 476, 60 S.Ct. at 357 and that there was a "natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." Ibid. The inference to be drawn from this language is that such sales do not constitute a taxable event, and that the final computation of gain or loss must await the acquiring corporation's disposition of the shares transferred to it. There being no loss on the ultimate disposition of the Goodlass stock, no loss may be recog-

nized for tax purposes now. To do so would compound the error originally made in 1937.

Whatever may be the merits of the general rule that the repayment of a debt is a separate event, taxwise, from the transaction which gave rise to that debt, see Elverson Corp. v. Helvering, 122 F.2d 295 (2 Cir. 1941); Bingham v. Commissioner, 105 F.2d 971 (2 Cir. 1939); Hale v. Helvering, 66 App.D.C. 242, 85 F.2d 819 (D.C.Cir. 1936); it has no application where the sale giving rise to the debt did not affect the creditor's economic position regarding the property.

For substantially the same reasons, we are also constrained to accept the Tax Court's holding that the dividends received by Hoyt on the Goodlass stock, and the gain it derived on the sales of Goodlass stock in 1951 and 1952, are properly allocable to the petitioner here. If the initial transfer lacked economic reality because of the transferor's continuing control over the property, we can see no basis for distinguishing these items from the one considered before. It is true that in Commissioner v. Smith, 136 F.2d 556 (2 Cir. 1943) involving the same individual taxpayer and corporation as in Higgins v. Smith, supra, we stated that the Commissioner was to consolidate the individual and corporate accounts for the years in question, including the income of both and all their properly deductible expenses and losses. However, we later stated, in O'Neill v. Commissioner, 170 F.2d 596, 597 (2 Cir. 1948) that "Higgins v. Smith * * * and the subsequent cases in which wholly owned and controlled corporations have been disregarded in whole or in part for tax purposes did not require the Commissioner, as a condition of his disregarding such a corporation for one tax purpose, to ignore it for all tax purposes." Since the separate existence of Hoyt is not challenged except with respect to the Goodlass stock, it would seem that proper recognition of this condition necessitates only allowing the foreign tax credit on the dividends Hoyt received from Goodlass, which the Commissioner has con-

ceded. Petitioner does not seek any other adjustment of its tax liability in this connection.

The judgment of the Tax Court is reversed in part and affirmed in part, and judgment will be entered accordingly.