*Decision will be entered for the respondent.*

DECON CORPORATION, AND ITS SUBSIDIARY, CONDE INVESTMENT CORPORATION, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9436–72.    Filed January 29, 1976.

*Paul Frederic Marx,* for the petitioners.
*Jeffrey C. Kahn,* for the respondent.

830

## OPINION

The issues remaining for our decision are whether the sale of the escrow position by Sanders to petitioner was a sham and should be ignored for income tax purposes, whether Sanders was acting in his own capacity or on behalf of Decon when he opened up the escrow, and whether petitioner actually abandoned the escrow position in the fall of 1967 as claimed.

Petitioner maintains the transaction was in substance what it was in form; that is, a sale by Sanders of escrow No. 54593-C to petitioner in exchange for the latter's promissory note in the face amount of $255,000. Petitioner contends that Sanders was prohibited from developing the Moral realty in his individual capacity by his employment contract and, therefore, the transfer here was necessary to maximize the property's potential profit by enabling such development.

Furthermore, petitioner argues, both buyer and seller believed the escrow position to be valuable at the time of transfer, and that under all the circumstances the method chosen in reaching a sale price was reasonable. Petitioner's cost basis in the escrow is, therefore, $255,000, with this being the appropriate measure of its loss on abandonment of its position in the fall of 1967, when the escrow failed to close.

Respondent, on the other hand, feels the transaction was a sham, the principal purpose of which was to avoid income tax. It is respondent's position that Sanders was at all times acting on behalf of petitioner during the negotiations on the property, and that the escrow position was opened for the petitioner even though Sanders' name appeared on the document. Since petitioner always owned the escrow position, it could not be said to have purchased it from Sanders and, therefore, the $255,000 note issued to Sanders was issued for some reason other than the purchase of the escrow position. Inasmuch as it cost nothing to open the escrow position, petitioner's basis in the escrow would be zero and no loss would be recognized on abandonment.

Alternatively, respondent argues that even if Sanders were the original purchaser and a transfer did occur, the transaction lacked a bona fide business purpose and was without economic substance. He contends the escrow position was worthless on the date of transfer and, therefore, nothing of value was transferred to petitioner for its $255,000 note. Again, the purchase price must have been paid for a purpose other than the purchase of the escrow, and thus, petitioner did not have a cost basis in the escrow, but rather a basis equal to the escrow's fair market value on the date of transfer. He concludes that, since this value was zero, there was no basis upon which an abandonment loss could be measured.

Section 165(a) of the Internal Revenue Code of 1954 [2] states: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

Respondent's regulations amplify section 165 in section 1.165-1, Income Tax Regs., which state in part:

(b) * * * Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

___

[2] All statutory references hereafter refer to the Internal Revenue Code of 1954, as in effect for the years in issue.

(c) * * * (1) The amount of loss allowable as a deduction under section 165(a) shall not exceed the amount prescribed by § 1.1011-1 as the adjusted basis for determining the loss from the sale or other disposition of the property involved. * * *

With respect to abandonment losses, the regulations state in section 1.165-2(a):

A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) * * *

The burden is upon petitioner to prove facts which would entitle it to the loss deduction claimed, and the amount of such deduction. *Burnet v. Houston,* 283 U.S. 223 (1931). However, its burden is not made more onerous by respondent's allegation of sham. *Mark Bixby,* 58 T.C. 757, 776 (1972).

In form, the transaction here resembled a sale. Sanders opened up and thereby "owned" escrow position No. 54593-C. He transferred the escrow to Decon in exchange for the latter's promissory note in the face amount of $255,000. But to discern the economic realities of the transfer we must look deeper.

Initially, we note that Sanders certainly had a tax motive in structuring the transaction as he did. He was about to lose a $308,025 net operating loss carryover if he could not offset it with a substantial amount of income by the end of 1966. He, therefore, could absorb the entire $255,000 of income in 1 year without any adverse tax consequences. Petitioner issued a note to Sanders for $255,000 in December 1966, which the latter reported on his income tax return for that year. Whether, as a cash basis taxpayer, Sanders was entitled to take a full $255,000 into income in the year he received the note is an issue not before this Court and we make no decision on that point. However, because he believed the entire $255,000 was income to him in 1966 and would offset his net operating loss, the motive for tax avoidance is present.[3] But the presence of a motive to reduce or avoid taxes will not render the transaction a sham if the transaction otherwise has sufficient economic substance to bring it within the relevant tax statutes as intended by Congress. As the

---

[3] We note it is the taxpayer's burden to show he was not acting to avoid taxes. *Hoffman Motors Corp. v. United States,* 473 F. 2d 254, 257 (2d Cir. 1973). *Starday Recording & Publishing Co. v. United States,* 281 F. Supp. 106, 108 (M.D. Tenn. 1967).

Supreme Court said in *Gregory v. Helvering,* 293 U.S. 465, 469 (1935):

The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted * * *. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.

Confirming this view, the court in *Nassau Lens Co. v. Commissioner,* 308 F. 2d 39, 45 (2d Cir. 1962), said:

In short, while the existence of a tax motive or the lack of a business purpose is the starting point for a challenge to the form of a transaction adopted by a taxpayer, it is, in the absence of legislative intent to the contrary, not the finish line, for if the substantive result is of the general type considered by Congress to be within the particular provisions involved, the fact that a different but equally feasible form would have resulted in a greater tax is of no consequence. * * *

In deciding "what was done" in the present case, we must look to the purpose of the transaction and then to any change in economic benefits flowing to petitioner and decide whether the transaction as described by petitioner accords with substantive economic reality. *Gilbert v. Commissioner,* 248 F. 2d 399, 406 (2d Cir. 1957).

As stated by the Supreme Court in *Higgins v. Smith,* 308 U.S. 473, 476-477 (1940):

The Government urges that the principle underlying *Gregory* v. *Helvering*[6] finds expression in the rule calling for a realistic approach to tax situations. As so broad and unchallenged a principle furnishes only a general direction, it is of little value in the solution of tax problems. If, on the other hand, the *Gregory* case is viewed as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability, it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration. * * *
* * *

The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. * * *

[Fn. omitted.]

In *Higgins,* the taxpayer had sold securities to his wholly owned corporation at a loss. Because of the control the taxpayer exercised over the operations of the corporation, the Court concluded "There is not enough of substance in such a sale finally to determine a loss."

Although *Higgins* dealt with a sale at a loss and we have a transfer resulting in a gain, we should not lose sight of the fact that absent this gain to Sanders, his loss carryover would have gone unrecognized. We think *Higgins* is controlling here. Cf. *Burnet v. Commonwealth Imp. Co.,* 287 U.S. 415 (1932).

In the present case, Sanders exercised a great deal of control over the operations of Decon by virtue of his ability to select two of the three directors of the corporation and direct the trustee how to vote the common stock. Further, the trustee had to use its "best efforts" to see that Sanders was appointed and remained president of the corporation at all times. As Irsfeld testified, the whole purpose of the corporation and trust was to enable Sanders to continue in the real estate business without fear of losing assets to preexisting creditors. Petitioner has not presented evidence sufficient to persuade us that Sanders lacked control of Decon Corp. and we conclude such control was present here. *Crown Cork International Corp.,* 4 T.C. 19, 25 (1944), affd. 149 F. 2d 968 (3d Cir. 1945).[4] Mere control alone, however, will not render the transaction a sham. *Sun Properties v. United States,* 220 F. 2d 171 (5th Cir. 1955). But such control may indicate the transfer was not made at arm's length. Sanders was effectively dealing with himself in transferring the escrow position to Decon, and this lack of arm's-length dealing gives us cause to scrutinize the transaction in applying the substance versus form test. *Sun Properties v. United States, supra* at 174.

Looking to the business purpose of the transaction, petitioner argues that its purpose was to enable proper development of the Moral realty to maximize the property's potential profit. This was something Sanders was allegedly prohibited from doing in his own capacity by his employment contract with petitioner. Sanders' own testimony, however, indicates the employment restriction was no longer in effect at the time he was considering purchasing the property. And less than a month following the transfer in question, but before anyone had acquired the property from Moral, petitioner formally entered into a new contract with Sanders permitting him to engage in the development of realty without first offering the property to the corporation.

---

[4] Cf. *Benjamin F. Haas,* T.C. Memo. 1956-165, finding the taxpayer to be in complete control of a corporation where the taxpayer's daughter was the sole owner of the corporation's stock.

Since Sanders believed he was not bound by the passive investment restriction in his employment contract, there was no need to transfer the escrow to petitioner for development of the realty. We are not persuaded that petitioner's alleged reason for the transfer was a bona fide business purpose behind the transaction.

There is authority, however, for the proposition that a sale of property needs no more business purpose than the realization of gain. In *Sun Properties v. United States, supra* at 174-175, the court stated: "Nor does the fact that this transaction may not have had any business purpose other than saving taxes, rationally imply that it was not a sale. No cases require that a *sale* have any business purpose beyond that of realizing capital gain. See Hobby, 2 T.C. 980."

We note the decision in *W. P. Hobby,* 2 T.C. 980 (1943), relied on by the court in *Sun Properties,* was the object of several dissents. Additionally, *Hobby* did not involve the transfer by a controlling shareholder to his corporation, although *Sun Properties* did. While not passing on the wisdom of this extension of our decision in *Hobby,* we feel both cases are distinguishable from the present case. The transactions in those cases were endowed with economic reality, in the sense that a real change in the flow of economic benefits resulted from the transfers in question. Cf. *John D. Gray,* 56 T.C. 1032, 1072 (1971). For reasons discussed below, we feel the transfer in the present case lacked sufficient economic reality to be recognized for income tax purposes.[5]

Perhaps the best indication the transaction here was a sham, designed to draw corporate profits out of the corporation without tax, was the value of the escrow position transferred. The escrow arrangement was in no sense a contract obligating Moral to sell the realty to Sanders, or the latter to buy it. The escrow instructions were never signed by anyone representing Moral, and although Sanders and others testified they believed the escrow

---

[5] Petitioner has drawn our attention to *Ralph E. Gordy,* 36 T.C. 855 (1961), for the proposition that the separate existence of an officer-majority shareholder and his corporation should be recognized in sales between the two. We think *Gordy* is not in point. While the sale did occur between the majority shareholder-president and his corporation, the issue in that case involved the imputation of the dealer status of the corporation to its president for purposes of characterizing the gain realized by the latter on the sale. The only question the Court had to decide was whether the taxpayer held the property primarily for sale to customers. Ours is a much different case. We are concerned here with the substance of the sale itself (i.e., whether it was a sham), not the character of gain realized. Since *Gordy* involves an entirely different issue, it is not applicable here.

would "close," all parties were well aware of the fact that Kupetz, attorney for the receiver in bankruptcy, had not committed Moral to any sale contract with Sanders prior to the transfer of the escrow position. The position then represented nothing more than an *offer of purchase* to Moral. We find it impossible to believe that anyone would realistically feel that this offer was worth anything close to $255,000. Kupetz and Collins both testified anyone could have opened up an escrow position on the property, and Kupetz stated further anyone could have made an offer of purchase. Escrow No. 54593-C gave petitioner no more right to acquire the Moral realty than it had before the transfer. The position was at all times contingent and neither seller nor buyer was ever committed to carry out the proposed sale.

Petitioner points out that many sales contracts or agreements are contingent on the buyer securing adequate financing, and this we do not doubt. However, petitioner has not shown us Moral entered into any agreement with Sanders or petitioner whether contingent on financing or anything else. Even if Sanders or petitioner had secured adequate financing, Moral would not have been obligated to sell the property to either of them. We do not feel petitioner's expectation that a sales agreement would soon be executed (and the escrows thereby closed) is sufficient to give the escrow here the effect of a contract or option to purchase the Moral property.[6]

Sanders testified he calculated the value of the escrow position to be one-third of the "built in" profit on the property, leaving two-thirds of such profit for the petitioner. However, what Sanders felt was one-third of the "built in" profit was actually one-third the difference between the two appraised values of the property.[7] This has nothing to do with "built in" profit, which

---

[6] It is not necessary to go into an exhaustive analysis of the California law of contracts to determine whether a binding contract was made between the parties prior to Dec. 9, 1966. We merely note that under California law preliminary negotiations leading up to the execution of a contract do not constitute a binding contract. Rather, there must be a meeting of the minds on all material terms of an agreement. *Dillingham v. Dahlgren,* 52 Cal. App. 322, 198 P. 832 (1st Dist. Ct. App. 1921); *Roberts v. Adams,* 164 Cal. App. 2d 312, 330 P. 2d 900 (2d Dist. Ct. App. 1958). Whether the parties intended to enter into an agreement or were merely negotiating its terms is a question of fact to be determined from all the evidence. *Carter v. Milestone,* 170 Cal. App. 2d 189, 338 P. 2d 569 (2d Dist. Ct. App. 1959). Having viewed all the evidence in the present case, we conclude no binding contract was ever intended by either Sanders or Moral for the purchase of the Moral realty, and no binding contract was, in fact, ever consummated.

[7] Even ignoring the fact that the two appraised values were made almost 2 years apart (see n. 1 *supra*), the method here is too faulty to be followed.

hinges on the purchase and sale prices. To demonstrate, we simply suggest that varying the purchase price of a piece of property up or down will not at all change the difference in the appraised value of the property nor the "built in" profit under Sanders' theory. It does, nevertheless, have a significant effect on the profit to be earned when property is purchased and later sold. For example, if the property has two appraised values of $3.5 million and $4.2 million, respectively, Sanders' computation of total built-in profit in such a case would be $0.7 million. This is true regardless of the purchase price. To illustrate the false premises of this approach, we will assume that the purchase price is only $1 million. This would give a minimum built-in profit on the first appraisal of $2.5 million and on the second appraisal, $3.2 million. Even an *average* of the two will give a built-in profit of $2.85 million. However, Sanders' method, no matter what the purchase price, always results in a $0.7 million built-in profit. We think the method is clearly without economic foundation, and cannot be used to value the escrow position transferred.

More fundamentally, Sanders' method fails to accurately value the escrow because fixing a value based on the "built in" profit assumes Sanders had a right to purchase the subject property at a stated price, as in an option. No such right existed in the present case, and there is no evidence at all that Sanders took this fact into consideration when valuing the escrow position. The escrow was never offered to any other purchaser, nor were any expert witnesses presented to testify as to its value. We are at a loss to understand how Mr. Sanders, who opened up the escrow position at no cost, considered the position to be worth $255,000 only 4 months later, while there was no change during this period regarding his right to purchase the property (which we have found did not exist). We think it suspect that petitioner would make an unconditional promise to pay the full $255,000 purchase price for a contingent escrow position which could, and did, ultimately prove worthless. Further, we think it was incumbent upon petitioner to put forth credible evidence of the value of the escrow position transferred. This it has failed to do. Consequently, we conclude the sales price was manifestly excessive, *Mountain Wholesale Co.,* 17 T.C. 870, 875 (1951),[8] and the

---

[8] Each case of this type must be decided on its own peculiar facts, and for this reason we think *Aqualane Shores, Inc.,* 30 T.C. 519, 527-528 (1958), cited to us by petitioner, is distinguishable. There the testimony of real estate experts indicated the value of the property in question was "far from static" and the sales price "approximately equivalent" to its

transaction, being without economic substance, was a sham. See *Mark Bixby, supra* at 776-777.

An additional indication that the supposed sale to Decon was a sham is the fact that the note to Sanders was never paid. Sanders testified he received varying payments on the note over a period of 5 years. But when asked to make a reasonable estimate of how much he had received in total, he could not do so. Petitioner contends that merely because there is no evidence of payment of the debt, we should not conclude there is no bona fide debt. For indeed, petitioner argues, the arrangement for payments could have been modified by the parties to the sale. This, of course, is true. But speculation as to what might have happened accomplishes little. Petitioner is in a better position than respondent to know why payments were or were not made and it has failed to give us any reliable evidence on this point.

Petitioner called Irsfeld, a director of the corporation, to testify that he believed the transfer of the escrow position to petitioner was not a sham. However, Irsfeld did not attend any directors meetings for the entire year preceding the transfer, nor did he attend the meeting on December 9, 1966, at which the transfer took place, nor did he even learn about the transfer until the spring of 1967, some 4 months after it occurred. We, therefore, do not find his testimony persuasive.[9]

Since we have determined the transfer from Sanders to Decon was without economic substance and is to be ignored for tax purposes, we now decide the consequences flowing from such a finding. Cf. *National Lead Co. v. Commissioner,* 336 F. 2d 134, 141 (2d Cir. 1964), cert. denied 380 U.S. 908 (1965).

In *National Lead Co. v. Commissioner, supra,* the sale of property at a loss to a wholly owned subsidiary created a debt from the subsidiary to its parent for the purchase price. The debt was carried on the books of the parent for years as an account receivable and was subsequently only partially satisfied. The parent took a capital loss deduction on the sale and then tried to

---

fair market value. No such evidence was presented here. The present case also differs materially from *Republic Petroleum Corp. v. United States,* 397 F. Supp. 900, 919 (E.D. La. 1975).

[9] Similarly, Leonard Poes, vice president in charge of construction of Decon Corp., testified that he considered the transfer of the escrow position to be bona fide and a good investment for petitioner. He did not, however, state his opinion of the value of the escrow or in any way indicate the underlying facts on which his conclusions were based. We find such conclusory statements of little weight in reaching our decision.

deduct a portion of the debt as an ordinary loss when it became partially worthless several years later. The court found the initial transfer to be a sham upon which no loss should have been realized (although the year was closed to the Commissioner), and further that once the sham was established, the transfer could not be said to have created a bona fide debt relationship. Since no debt existed, no loss was realized when part of the debt became worthless.

In our case, we have found the transfer to petitioner to be a sham, lacking substantial economic reality. We think that petitioner could not be said to have acquired a cost basis in the asset transferred sufficient to allow it a loss deduction on abandonment under section 165. As in *National Lead Co. v. Commissioner, supra,* the sham transaction cannot be treated as having created a bona fide debt between petitioner and Sanders, and without such bona fide debt, petitioner has no basis in the escrow position on which a loss deduction could be claimed.

Having decided the case as we have, we find it unnecessary to decide whether Sanders was acting on his own behalf when he opened the escrow position, or whether an abandonment actually occurred in the fall of 1967.

Because of concessions,

*Decision will be entered under Rule 155.*