## LOUIS ADLER REALTY COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5643.   Promulgated April 19, 1946.

*Ferdinand Tannenbaum, Esq., Seymour Klein, Esq.,* and *Henry Homes, C. P. A.,* for the petitioner.

*Sidney B. Gambill, Esq.,* and *Laurence F. Casey, Esq.,* for the respondent.

BLACK, *Judge*: Section 23 (b) of the Revenue Act of 1938, the applicable statute involved, provides that in computing net income there shall be allowed as a deduction "All interest paid or accrued within the taxable year on indebtedness \* \* \*."

Petitioner contends that during the entire taxable year it had an outstanding indebtedness of $1,717,500 upon which it was obligated to pay interest at the rate of 5 percent per annum. The respondent contends that Thurlim and the three trusts were in substance petitioner's controlled agents or nominees; that, through Thurlim and the trusts, petitioner must be considered as having purchased its own indebtedness, which thereupon ceased to be an outstanding indebtedness upon which interest is accruable and deductible for tax purposes; and that the only indebtedness upon which petitioner is entitled to deduct interest is the outstanding indebtedness of petitioner's subservient agent, Thurlim, to Manufacturers Trust Co., which bore interest at the rate of 4 percent per annum and consisted of $350,000 at the beginning of the taxable year, which amount was reduced to $300,000 on July 1, 1938, and to $200,000 on December 9, 1938. We agree with the respondent.

The respondent does not question the validity or *bona fides* of the original bond and mortgage which were issued by petitioner's wholly owned subsidiary, Stiplate, in 1935 as consideration for the transfer of title to the real estate in question. It is the manner in which this bond and mortgage were acquired from Trinity that raises the tax question at issue. In 1937 it was learned that Trinity was willing to accept $600,000 in cash in full payment for the obligation of $1,717,500 which had been created two years before. If petitioner had directly liquidated its 1935 obligation by paying Trinity the $600,000 either with its own or borrowed funds, it is obvious that the present question would not have arisen. We think, however, that petitioner has indirectly accomplished the same result by permitting its funds to be used by Thurlim and the three trusts in the manner set out in our findings.

In *1432 Broadway Corporation*, 4 T. C. 1158 (on appeal to C. C. A., 2d Cir.), we had the question of the deductibility of interest before us and in the course of our opinion we said:

* * * Although a taxpayer has the right to cast his transactions in such form as he chooses, and the form he chooses will generally be respected, the Government is not required to acquiesce in the taxpayer's election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. "The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purpose of the tax statute." *Higgins* v. *Smith*, 308 U. S. 473. See also *Commissioner* v. *Court Holding Co.*, 324 U. S. 331. * * *

Cf. *W. C. Hay*, 2 T. C. 460; affd., 145 Fed. (2d) 1001. In the *Hay* case the taxpayer, with the primary object of escaping estate and income taxes, being a naturalized citizen, repatriated himself as a Canadian citizen, organized a Nassau corporation, transferred to that corporation all the stock of a California company, and four months thereafter caused the Nassau corporation to liquidate the California company. On these facts, relying on such cases as *Higgens* v. *Smith*, 308 U. S. 473, and *Griffiths* v. *Commissioner*, 308 U. S. 355, we held the Nassau corporation lacked business purpose, its existence should therefore be disregarded for tax purposes, and the liquidation of the California company was in effect a distribution to the taxpayer, William C. Hay, individually.

We think the principles stated in the foregoing cases are applicable here. In 1937, when Adler learned that Trinity was considering discounting the second mortgage for approximately one-third of its face value, he talked the matter over with his wife and son and they in turn consulted their accountants and lawyers. At that time Thurlim was nothing but an empty shell. It had not yet issued any of its capital stock. It owned no assets. Adler, the sole stockholder of petitioner, had caused Thurlim to be incorporated several months before, but it transacted no business until October 29, 1937, when it wrote the letter to Trinity offering to purchase the bond and mortgage in question for the sum of $600,000 and tendered its check for $50,000 as a down payment. As indicated in our findings, this $50,000 originally came from petitioner in the manner detailed in our findings. Trinity accepted the offer to purchase on November 2, 1937, and on the following day the trusts were created and Thurlim issued all of its stock to the trusts for a total consideration of $1,000 and entered into an agreement with the trusts to sell them the bond and mortgage it was purchasing from Trinity for the same amount of $600,000, agreeing to take a promissory note from each trust for the amount of $200,000. Adler arranged with the Manufacturers Trust Co. for it to loan Thurlim $400,000 on his personal signature and security deposited by Adler and his wife. The balance of the purchase price was furnished by Adler as a loan to Thurlim. After this was done,

petitioner began paying the so-called interest on the original amount of $1,717,500 to the trusts, which in turn would pay it over to Thurlim as a part payment on the $200,000 notes, and Thurlim would then use it to pay off its obligations to the Manufacturers Trust Co., petitioner, and Adler. As shown in our findings, petitioner loaned Thurlim a total of $308,100 from May 7, 1938, to June 10, 1942. This was separate and apart from the so-called interest. Most of this $308,100 was used by Thurlim to pay off its borrowings from the Manufacturers Trust Co. Up to May 31, 1941, petitioner had also advanced to the trusts a total of $110,833.73 in addition to the so-called interest which was used by the trusts to pay taxes, insurance, premiums and other such items. After Trinity had received the final payment on January 14, 1938, it executed and delivered an assignment of the bond and mortgage to Thurlim, which was then placed in petitioner's safe, where it has since remained. We think that, when consideration is given to the entire record, the conclusion must be that Thurlim and the trusts were simply being used by petitioner as its agents or nominees in the purchase of petitioner's outstanding indebtedness at a substantial discount.

The Supreme Court has held that the usual import of the term interest "is the amount which one has contracted to pay for the use of borrowed money." *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552; *Deputy* v. *Du Pont*, 308 U. S. 488. During the taxable year petitioner made two payments of so-called interest to the trusts; one on July 1, 1938, in the amount of $47,470, and one on January 3, 1939, in the amount of $42,937.50. The trusts passed both payments over to Thurlim, to be applied on the notes. Thurlim turned the first payment over to Manufacturers Trust Co. and returned the second payment to petitioner. Petitioner has not shown to our satisfaction that these payments by petitioner were in truth and substance compensation for the use of money. We think the only real payments of interest were those made by Thurlim to Manufacturers Trust Co., which we hold were made for petitioner's benefit. The parties agree that the sums so paid or accrued during the tax year amounted to $10,235.62. As has already been stated, the Commissioner in his determination of the deficiency allowed petitioner a deduction of $30,000 interest on account of the transactions here involved. Respondent in his amended answer alleges that he erred in this respect and that he should have allowed only $10,235.62, and he asks for an increased deficiency accordingly. The burden of proof is, of course, upon respondent to sustain these affirmative allegations. For reasons we have stated above, we think that burden has been discharged and that petitioner is entitled to have allowed a deduction for interest

of only $10,235.62, as the Commissioner has claimed in his amended answer. We so hold.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DISNEY, *J.*, concurs only in the result.

---

OPPER, *J.*, concurring: In making the determination now in issue respondent "decreased" the deduction for mortgage interest as "in accordance with the provisions of the Internal Revenue Code." A provision of the code which seems to conform exactly to the present facts and would by its express terms warrant the Commissioner's action is section 45:

SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The fact that there is no reference to that section by number in the notice of deficiency where, as here, "it may be assumed that the adjustment was made in order that the real income of the petitioner might be clearly reflected," is not necessarily an impediment to its application by us. *Gordon Can Co.*, 29 B. T. A. 272. There can be no question of petitioner's awareness of its relevance to the present proceeding as is indicated by the reliance in its brief upon a case where the application of that section was the basic issue. *Seminole Flavor Co.*, 4 T. C. 1215.

SMITH and LEECH, *JJ.*, concur in the above.

---

KERN, *J.*, dissenting: Respondent asks us to disregard the separate and independent entities of the Thurlim Realty Corporation and of the three Adler family trusts on the theory that they were acting for petitioner's benefit, as its nominees or controlled agents. Respondent then continues his argument by contending that petitioner has brought the second mortgage indebtedness under its own legal and economic control by the use of its funds and through the subservient trusts and the subservient Thurlim Realty Corporation. Therefore, respondent concludes, petitioner must be considered as having purchased its own indebtedness, which thereupon ceased to be an outstanding indebted-

ness during the taxable year upon which interest is accruable and deductible for tax purposes.

As authority for his contention respondent relies on general language contained in *Commissioner* v. *Court Holding Co.*, 324 U. S. 331; *Anderson* v. *Abbott*, 321 U. S. 349; *Higgins* v. *Smith*, 308 U. S. 473; and *Griffiths* v. *Helvering*, 308 U. S. 355.

The majority opinion accepts and approves the argument of respondent, and cites as authority *W. C. Hay*, 2 T. C. 460; affd., 145 Fed. (2d) 1001, and a dictum in our opinion in *1432 Broadway Corporation*, 4 T. C. 1158.

I am unable to agree. The basic reason for my disagreement is the fact that in this case the petitioner corporation did not cause the incorporation of Thurlim or the formation of the Adler family trusts and did not control them. Therefore, the conclusion can not be reached in my opinion that the petitioner corporation, directly or indirectly, purchased the indebtedness secured by a mortgage on its property, either itself or through agencies which petitioner itself controlled. This indebtedness at all times remained an outstanding obligation secured by a mortgage on petitioner's property pursuant to which interest was payable by petitioner. The truth is that Thurlim was controlled by Adler either directly, or indirectly through the Adler family trusts, in much the same way in which Adler controlled petitioner itself through ownership of its stock. However, it can not be said that petitioner corporation so controlled Thurlim or the Adler family trusts that the acquisition by Thurlim or the trusts of the petitioner's mortgage indebtedness was equivalent to an acquisition thereof by petitioner. The fact that petitioner was caused by its controlling stockholder to advance money to him and to Thurlim does not establish petitioner's control over Thurlim, but rather establishes Adler's control over both petitioner and Thurlim; and the fact that petitioner and Thurlim were controlled by the same stockholder does not result in a relationship between the two corporations of reciprocal agency. Even though we consider the situation with the realistic approach approved by the cases cited by respondent and disregard legalistic technicalities, I am unable to consider ownership by corporation A as equivalent to ownership by corporation B because the two corporations are controlled by the ownership of their respective common stock by the same individual or group of individuals. *A fortiori*, ownership by trusts of which Adler's wife, son, and daughter were beneficiaries is not equivalent to ownership by petitioner corporation, all of whose stock was owned by Adler.

It should be pointed out that no question arises as to the *bona fides* or business purpose of the debt here involved before its acquisition by Thurlim. The crux of respondent's argument is that that debt must be considered by us as having been acquired in effect by the petitioner.

In support of this position he argues that no business purpose existed for its acquisition by Thurlim. We understand this argument to be that from petitioner's standpoint there was no business purpose for Thurlim to acquire the indebtedness rather than petitioner. This argument would be pertinent only upon the assumption that petitioner created and controlled Thurlim and caused the latter as its agent to acquire the indebtedness. As we have already pointed out we are unable to accept this assumption and therefore the argument based upon it is without validity.

In this case the transaction actually accomplished by Adler and the members of his family resulted in a tax advantage to petitioner, as well as to Adler, which would not have been available to it if it had purchased and retired the indebtedness. This fact, however, does not justify us in treating possibilities as actualities for the purpose of imposing upon petitioner an increased tax burden. See *Seminole Flavor Co.*, 4 T. C. 1215.

The cases cited by the majority would, in my opinion, be relevant only to a situation where corporations or trusts were created and controlled by the taxpayer itself for no business purpose other than to minimize the tax liability of the taxpayer who created and controlled them. They are not relevant to the situation presented in the instant case, where the taxpayer corporation did not create or control either Thurlim or the trusts.

It should be pointed out that the tax liability of Adler, who controlled petitioner as well as Thurlim and the trusts, is not here in question, and that the respondent makes no contention that the corporate entity of petitioner should be disregarded. In my opinion, the majority has, in its reasoning, approached the problem as if the petitioner corporation were Adler or had done those things which Adler did. This approach is not warranted by the record, the pleadings, or the law, and the result reached compels my dissent.