WILLIAM O. DERR AND THOMASINE G. DERR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8947–77.     Filed September 29, 1981.

*Clarence G. Ashby*, for the petitioners.
*Lewis J. Hubbard, Jr.*, for the respondent.

WILES, *Judge*: Respondent determined a $6,184.80 deficiency in petitioners' 1973 Federal income tax. After a concession by respondent, the sole issue for decision is whether petitioner William O. Derr, a limited partner in the Aragon Apartments partnership, is entitled to deduct his distributive share of the partnership loss for 1973. The resolution of this issue turns on whether the partnership is entitled to various deductions in connection with the ownership and operation of an apartment complex in 1973.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

William O. Derr (hereinafter petitioner) and Thomasine G. Derr, husband and wife, resided in Jacksonville, Fla., when they filed their petition in this case. They filed their 1973 joint Federal income tax return with the Office of the Director, Internal Revenue Service Center, Kansas City, Mo.

During 1973, petitioner was a limited partner in the following partnerships: Aragon Apartments, Edens East Apartments, and Manor Apartments. Petitioner acquired these partnership interests as tax shelter investments.

In the early 1970's, Edward J. Reilly (hereinafter Reilly), a registered Illinois securities dealer, was involved extensively in the syndication of real estate limited partnerships. From 1970 through 1972, Reilly was the underwriter of record for 60 Illinois limited partnerships, including Edens East Apartments and Manor Apartments. During 1973, Reilly owned all the capital stock of the following Illinois corporations: Edward J. Reilly Partnerships Inc. (hereinafter Partnerships Inc.) and the Happiest Partner Corp. (hereinafter HPC). Partnerships Inc. was a registered Illinois securities underwriter, and HPC was a licensed Illinois real estate brokerage firm.

In early 1973, the construction of four brick buildings, containing 88 total apartment units, on a parcel of real property located in Des Plaines, Ill., was completed. The land and buildings were known as the Foxcroft Apartments (hereinafter sometimes referred to as the apartment complex), and were owned under an Illinois land trust established on February 15, 1972, of which Victor Smigel (hereinafter Smigel) was the sole beneficiary, and the National Bank of Austin was the trustee. On December 9, 1972, the apartment complex was mortgaged in the name of the trustee to Austin Federal Savings & Loan Association of Chicago (hereinafter Austin Federal) to secure a loan in the principal amount of $1,280,000. The apartment complex was subject to this mortgage through July 1, 1974. The loan was payable in monthly installments of $10,306.90, with the final payment due on December 1, 1996. Neither Smigel nor the National Bank of Austin was personally liable for this loan.

Sometime in early 1973, Reilly decided to package the

Foxcroft Apartments as a limited partnership, using the name Aragon Apartments (hereinafter Aragon or the partnership). To this end, in the spring of 1973, he caused the publication of a prospectus offering the sale of securities (hereinafter partnership units) in Aragon to Illinois residents, pursuant to the Illinois Securities Law of 1953. Aragon was described as a limited partnership "being formed to purchase and hold title to four apartment buildings containing a total of 88 apartment units commonly known as Foxcroft, Des Plaines, Illinois, and personal property used in the operation thereof." The prospectus provided that Reilly would be the general partner and portrayed him as an expert in both real estate partnership and tax shelter investments.

Partnerships Inc. was named the underwriter-dealer for the offering within the meaning of Illinois law. As the underwriter-dealer, Partnerships Inc. marketed the partnership units in Aragon. The purchase price per partnership unit was $1,721, payable in two installments: (1) $1,000 prior to the closing on the apartment complex in 1973, and (2) $721 on July 1, 1974. The minimum subscription for any limited partner was set at 11 units for a total purchase price of $18,931, with Partnerships Inc. reserving the right to reduce the minimum subscription in the event some limited partners subscribed to more than 11 units.

According to the prospectus, the sale of partnership units would raise $370,000, $340,400 from the limited partners for 92 percent of the total partnership units, and $29,600 from the general partner, Reilly, for the remaining 8 percent. The prospectus stated that all funds raised from the sale of partnership units would be deposited in an escrow account that was under the sole control of Partnerships Inc. In this escrow account, Partnerships Inc. held the funds of various partnerships with which it was associated.

The prospectus provided that the partnership's objectives were "large tax shelters, income and equity growth." With respect to Aragon's tax shelter potential, the prospectus indicated that the partnership would have "tax deductions in 1973 in excess of operating income and mortgage reduction as a result of prepaid interest, prepaid management fee paid at closing, contract financing 'points,' depreciation and personal property bonus depreciation."

According to the prospectus, HPC had entered into a contract to purchase the Foxcroft Apartments and was prepared to sell its contractual interest in the property to Aragon for a total purchase price of $1,650,000.[1] Aragon would "receive a credit for the mortgage balance of approximately $1,280,000" and pay HPC the balance of $370,000 as follows: (1) $215,000 at closing and (2) $155,000 on July 1, 1974. With respect to the terms of the sale to Aragon, the prospectus further provided:

THE HAPPIEST PARTNER CORPORATION is contracting to sell its contractural interest in the subject real estate. This purchase contract provides for 1974 interest in the amount of $128,000 to be prepaid in 1973. THE HAPPIEST PARTNER CORPORATION, as seller, will accept the prepaid interest as ordinary income so that the partnership can obtain an immediate tax deduction. The monthly cash payments to THE HAPPIEST PARTNER CORPORATION under the purchase contract will be identical with the monthly payments by THE HAPPIEST PARTNER CORPORATION on the mortgage. The effect of this contract on the partnership is to pay 1973 and 1974 interest at closing and add to the contract balance due THE HAPPIEST PARTNER CORPORATION. Interest due for 1975 shall be paid in 1974. Approximately one half of 1976 interest will be paid in 1975 and the balance of the 1976 interest will be paid in 1976.

Please note that although the purchaser's contract balance is higher (because of the addition of prepaid interest), a lower effective interest rate is charged in the purchase contract. However, monthly cash payments are the same, and with the lower interest rate, there is a larger reduction of principal on the purchase contract. It is anticipated that the partnership purchase contract balance will be the same as the first mortgage, about October, 1976, and THE HAPPIEST PARTNER CORPORATION will then assign the beneficial interest in the trust to the Partnership.

While the prospectus stated that the sale to the partnership should be closed no later than July 1, 1973, it warned that "There is no positive assurance that the real estate transaction will be closed and the securities actually issued."

The prospectus sets forth the following breakdown of the use of the $370,000 to be raised from the sale of the partnership units:

---

[1] A copy of a document entitled "Articles of Agreement" was attached to the prospectus. This document represented the agreement between HPC and Aragon with respect to the sale of the apartment complex.

|  | At closing | 1974 (1 year later) |
|---|---|---|
| Purchase price | $2,250 | $63,000 |
| Management fees | 52,750 | 28,000 |
| Contract financing points | 32,000 | --- |
| Prepaid interest | 128,000 | 64,000 |
|  | 215,000 | 155,000 |

The prospectus indicated that the management fees, contract financing points, and prepaid interest would be fully deductible in the year paid. It further stated that the above-described management fees would be paid to the general partner for "general supervision of the Partnership as well as the day-to-day operation of the Partnership property." In addition to these payments, the prospectus provided that the general partner would be entitled to a management fee "equal to five percent of the gross annual collected income from the partnership property" for his general supervision. Finally, the prospectus stated that the above-described contract financing points would be paid to HPC "for its services relating to the first mortgage financing for the partnership property."

On May 19, 1973, petitioner purchased 11 partnership units in Aragon, thereby acquiring a 5.116-percent interest in the partnership's profits and losses. At that time, he paid the first installment of the purchase price by drawing a check for $11,309[2] payable to the Partnerships Inc. escrow account. Petitioner received a letter of confirmation, dated May 21, 1973, which stated that his funds were "accepted to purchase securities on a 'when, as, if' issued basis." On July 26, 1974, petitioner paid the second and final installment of the purchase price, $7,931, for his interest in Aragon.

Although the prospectus indicated that HPC had entered into a contract to purchase the apartment complex, no such contract was in effect at the time the prospectus was published. On June 30, 1973, however, HPC, as "purchaser," and the National Bank of Austin and Smigel, collectively referred to as "seller," did execute a document entitled "Installment Contract for Deed and Net Lease" (hereinafter installment contract) agreeing to sell the apartment complex, including

---

[2]Petitioner made an overpayment of the first installment in the amount of $309 which was eventually refunded.

personal property appurtenant to or used in the operation of the premises, to HPC. Under the installment contract, there were two closings: (1) The preliminary closing within 60 days after the execution of the contract, and (2) the final closing on the first anniversary of the preliminary closing, or such earlier date as elected by HPC. The stated purchase price was $220,000 plus the actual unpaid balance of the principal and accrued interest on the underlying mortgage to Austin Federal,[3] which was payable as follows: (1) $1,000 upon signing the contract; (2) $99,000 at the preliminary closing; (3) acceptance of title to the property subject to the mortgage on the date of the final closing; and (4) $120,000 at the final closing.

On the date of the preliminary closing, the installment contract provided that HPC would receive endorsements to all insurance policies covering the apartment complex, naming HPC as an additional insured. In addition, the installment contract provided that as of the date of the preliminary closing, HPC would be entitled to all depreciation on the apartment complex "allowed or allowable pursuant to the provisions of the Internal Revenue Code as amended."

With respect to the period of time between the preliminary closing and the final closing, the installment contract provided that the seller would retain legal title and remain in possession and control of the premises. During that same period, the seller would collect all rents and other income from the premises and pay all the expenses thereof, including the payments on the mortgage. Moreover, the installment contract specifically provided that all rents accruing prior to the final closing were the property of the seller and that all rents accruing after the final closing were the property of the purchaser, HPC. For the "use and occupancy" of the apartment complex during the interim between the preliminary and final closing, the seller was required to pay HPC $1,000 per month, with Smigel agreeing to make these payments. The installment contract stated that the seller was retaining legal title and possession and control of the premises solely as security for HPC's obligation to pay the seller $120,000 at the final closing.

---

[3]The installment contract stated that as of June 30, 1973, the principal balance of the mortgage was within 1 percent of $1,280,000.

Pursuant to the installment contract, Smigel agreed that until the final closing he would maintain the premises and personal property in as "good condition," excepting ordinary wear and tear, as of the date of the contract and would make all repairs, replacements, substitutions, improvements, and additions, structural or otherwise, necessary to keep the property in good repair. If the replacement of any personal property transferred under the installment contract became necessary, he agreed to replace the property at his own expense, such replacements becoming the property of HPC at the final closing, without any compensation to Smigel therefor. When the need for the replacement of personal property arose due to wear or obsolescence, Smigel was obligated to replace the same with "new and similar" property having a value no less than the cost of that replaced. Smigel also agreed to keep the premises and personal property free from liens and claims for liens and to defend, at his own expense, any action, proceeding, or claim affecting the premises or personal property, or arising out of the seller's operation of the premises, while holding HPC and its assigns harmless therefrom.

In the event of a default by HPC, the installment contract provided that the seller would retain any money paid by HPC as liquidated damages and the contract would have "no further force or effect," with HPC forfeiting any equitable interest in the property. Furthermore, HPC had the option to rescind the installment contract if all or any part of the premises was destroyed by fire or other casualty prior to the final closing. In that case, any money previously paid would be returned to HPC. If HPC, however, did not elect to rescind the installment contract, the seller would be required to assign HPC its right to any insurance proceeds at the final closing.

On the date of the final closing, the installment contract provided that rents, interest on the mortgage, insurance premiums, real estate taxes, utilities, and other similar expenses would be prorated and credited or charged, as appropriate, against the $120,000 payment due from HPC. In addition, HPC and Smigel executed an undated "rider" to the installment contract whereby HPC agreed, notwithstanding anything to the contrary in the installment contract, to pay the seller on the date of the final closing an amount equal to the difference between the face amount of the mortgage,

$1,280,000, and the principal balance of the mortgage on that date.

In a letter dated October 24, 1973, from HPC to Smigel, HPC purportedly sought clarification of the installment contract as follows:

It was our agreement that you would retain legal title of the property solely as security [for the payment required at the final closing] * * * and that until that payment was made you would be operating and managing the property on our behalf and for our benefit as owner. In other words, you would collect all rents on our behalf and would make all required disbursements to include real estates [sic] on our behalf.

Your compensation for operating the building would be the net cash income of the project in excess of $1,000 per month. This $1,000 per month would be paid to us as our profit.

If the above correctly states our understanding, please indicate by signing the enclosed copy of this letter and return it to me.

As requested, Smigel indicated his approval by signing the letter.

On July 1, 1973, HPC and Aragon executed a document entitled "Articles of Agreement," whereby HPC agreed to transfer to Aragon its beneficial interest in the land trust under which title to the apartment complex was held. Reilly signed the document on behalf of both HPC, as president, and Aragon, as general partner. Aragon agreed to pay HPC a total purchase price of $1,650,000, the articles of agreement stating:

B. Apartments [Aragon] hereby covenant and agree to pay Happiest [HPC] a total purchase price for the real estate and personal property thereon of One Million Six Hundred Fifty Thousand ($1,650,000) Dollars with interest thereon at the rate as next set forth, in the following manner:

1. The sum of $2,250 on account of the principal amount last described, concurrently with execution hereof.

2. The sum of $63,000 on account of the principal amount last described on July 1, 1974.

3. The sum of $32,000 points at closing on the unpaid balance.

4. The sum of $192,000 in payment of interest due at the rate of 3.5% per annum on the sum of ($1,472,000) for the balance of 1973 and 1974.

5. One Million Four Hundred Seventy Two Thousand ($1,472,000) of said principal sum and interest thereof at the rate of 3.5% per annum for 1975 shall be paid in monthly installments of $10,307 each, commencing as of August 1, 1973, and continuing on the first day of each month thereafter until full payment of said principal sum and interest thereon. The payments to be made pursuant to this subscription shall be applied during the year 1974 against interest on the principal balance as of January 1, 1974 and 1975 and any remainder against said principal balance; during the year 1975

against interest on the principal balance as on January 1, 1975 for the period from January 1, 1976 through June 30, 1976 and any remainder against principal balance as of January 1976; for the period from July 1, 1976 through December 31, 1976, and any remainder against the principal balance due hereunder.

C. Against the principal sum described in Section B, Apartments shall be entitled to a credit in the amount of the prorata share of the unpaid balance due on the first mortgage. Accordingly, when the principal balance hereunder, computed as set forth in Section B has been reduced to the then unpaid principal balance of said mortgage, but not prior to October 1976, Happiest shall assign its interest in the subject property to Apartments without further payment to Happiest.

The articles of agreement recited that HPC had contracted to purchase the apartment complex and that HPC's "ability to convey title" was expressly conditioned upon acquiring title from its seller. In contrast to the installment contract, the articles of agreement provided that on the date of its execution, possession of the apartment complex would be delivered to Aragon and that Aragon would be entitled to the "cash flow net operating income" therefrom. In addition, Aragon agreed to pay all taxes and assessments levied upon the property subsequent to that date and to make monthly escrow deposits with respect thereto.

Sometime in 1973, HPC and Aragon executed another agreement entitled "Real Estate Management Agreement" (hereinafter management agreement). Again, Reilly signed the document on behalf of both HPC and Aragon. Pursuant to the management agreement, HPC promised to manage the apartment complex in exchange for a fee equal to 5 percent of the gross annual collected operating income from the property. The management agreement set forth the following limitation on the payment of this fee:

Payment of the management fee will be subordinated to the limited partners' first receiving a minimum annual cash distribution of 5% of said limited partners' original investment commencing 12 months after closing and continuing during the calendar years 1975 and 1976, so that Happiest [HPC] shall only receive at any time that portion of its fee, if any, remaining after payment of such 5% to the limited partners as so provided.

In exchange for the management fee, the management agreement provided that Aragon would receive the following:

A. Management and clerical personnel in Happiest's [HPC's] offices to supervise all project activities as necessary.

B. Accounting services for the property and the partnership, including monthly cash distributions, annual financial reports and partnership tax returns.

By August 8, 1973, the sum of $215,000 attributable to the payment of the first installment of the purchase price for the Aragon partnership units, had been deposited in the Partnership Inc. escrow account on behalf of Aragon. On or before August 8, 1973, the preliminary closing under the installment contract was consummated, and $100,000 was paid to Smigel from the Aragon funds held in the escrow account, while the remaining $115,000 of those funds was paid to HPC.

On August 7, 1973, petitioner executed the signature page of the "Aragon Apartments Limited Partnership Agreement" (hereinafter partnership agreement), and on December 13, 1973, the partnership agreement became effective. The partnership agreement provided that the partnership's business would be conducted under the name of "Aragon Apartments" and named Reilly the general partner. In addition, the partnership agreement stated that the general partner would make a total capital contribution of $29,600 to the partnership, payable in two installments: (1) $17,200 at closing and (2) $12,400 one year thereafter. In exchange for this contribution, the general partner received an 8-percent interest in the partnership's profits and losses. Finally, the partnership agreement provided that the general partner or his designated representative would manage the partnership's business.

During 1973, Aragon neither maintained a formal set of records nor had a bank account other than the Partnerships Inc. escrow account. In February 1974, financial statements for the period ending December 31, 1973, were prepared for Aragon by a Chicago accounting firm, Kupferberg, Goldberg, Borkan & Co. (hereinafter accountants). The accountants prepared the financial statements from information provided to them without conducting an audit of Aragon. Since they had not conducted an audit of Aragon, the accountants refused to render an opinion "as to the fairness of the financial statements" or "their conformity with generally accepted accounting principles."

According to the "Statement of Financial Position," Aragon had the following fixed assets as of December 31, 1973:

| | |
|---|---|
| Land.......................................... | $132,000 |
| Building ...................................... | 1,213,570 |
| Equipment.................................. | 191,680 |
| Total....................................... | 1,537,250 |
| Less accumulated depreciation ........ | 64,058 |
| Net fixed assets........................... | 1,473,192 |

All of these assets were attributable to the apartment complex.

In addition, the "Statement of Operating Results" asserted that Aragon had the following income and expenses for 1973:

STATEMENT OF OPERATING RESULTS
(Cash basis),
For the Period from Aug. 1, 1973
(Assigned Date of Formation) to Dec. 31, 1973
(Without audit)

| | | |
|---|---|---|
| Rental income................................................... | | $85,497.13 |
| Operating expenses: [4] | | |
| Advertising ................................. | $242.32 | |
| Insurance.................................... | 3,218.00 | |
| Interest on contract payable[5] .......... | 22,210.66 | |
| Miscellaneous ............................. | 1,517.48 | |
| Real estate taxes and | | |
| management fee .......................... | 15,664.06 | |
| Scavenger .................................. | 802.00 | |
| Utilities..................................... | 4,173.27 | |
| Total operating expenses ......................................... | | 47,827.79 |
| Income before depreciation and other expense.................. | | 37,669.34 |
| Depreciation and other expense: | | |
| (Note 2)[6] | | |
| Depreciation (Note 1)[6].................. | 64,058.00 | |
| Management fee.......................... | 52,750.00 | |

[4]All of the operating expenses, except "Interest on contract payable," were paid by Smigel.

[5]Although the source of this item is unclear, we believe it is attributable to the interest portion of the monthly payments due under the articles of agreement.

[6]Note 1 and Note 2 to the statement of operating results stated as follows:

"Note 1—Allocation of real estate acquired into the component parts of land, building and equipment and the estimated life used for depreciation is in accordance with the purchase contract between the partnership and 'The Happiest Partner Corporation,' a company wholly-owned by the general partner.

"Note 2—No prior ruling from the Internal Revenue Service was or will be sought with respect to this partnership or the tax deductions as taken."

Contrary to the statement contained in Note 1, the articles of agreement did not allocate the purchase price among the acquired assets.

Contract finance fee..................... $32,000.00
Prepaid interest......................... 128,000.00

Total depreciation and other expense.......................... $276,808.00

Net (loss) for the period........................................... (239,138.66)

For the period from August 1, 1973, through December 31, 1973, Reilly timely filed a 1973 partnership return of income[7] (Form 1065) for Aragon which had been prepared by Aragon's accountants. Using the cash receipts and disbursements method of accounting, the return reported rental income of $85,497.13 and claimed the following deductions:

| *Item* | *Amount* |
|---|---|
| Depreciation............................................. | $40,122.00 |
| Additional first year depreciation ................. | 23,936.00 |
| Interest................................................. | [8] 150,210.66 |
| Contract financing fee................................ | 32,000.00 |
| Taxes and management fee ......................... | 68,414.06 |
| Utilities................................................ | 4,173.27 |
| Insurance ............................................. | 3,218.00 |
| Scavenger service .................................... | 802.00 |
| Advertising............................................ | 242.32 |
| Miscellaneous......................................... | 1,517.48 |

On Schedule K (Partner's Shares of Income, Credits, Deductions, Etc.) of the return, an ordinary loss of $215,202.66, and additional first-year depreciation of $23,936 were reported as the partnership's distributive share items. Furthermore, the Schedule K–1 (Partner's Share of Income, Credits, Deductions, Etc.) filed with respect to petitioner reported $11,967.42 of ordinary loss and $1,331.08 of additional first-year depreciation as his share of the partnership's distributive share items. On Schedule L (Balance Sheets) of the return, the partnership claimed total fixed assets of $1,537,250, attributable to the following amounts:

(1) Buildings and other fixed depreciable assets—$1,405,250
(2) Land—$132,000

By July 1, 1974, an additional $155,000, attributable to the

---

[7]The return stated that Aragon commenced business on Aug. 1, 1973.

[8]This figure represents the sum of the amounts set forth in the Statement of Operating Results under the headings of "Prepaid interest" and "Interest on contract payable."

payment of the second installment of the purchase price for the Aragon partnership units, had been deposited in the Partnerships Inc. escrow account on behalf of Aragon. On July 1, 1974, the final closing under the installment contract was concluded. At that time, $155,000 was transferred to HPC from the Partnerships Inc. escrow account on behalf of Aragon, and HPC paid the balance of the purchase price due under the installment contract. Thereafter, the apartment complex was deeded to La Salle National Bank, as trustee, pursuant to a trust agreement dated June 24, 1974, under which Aragon was the beneficiary.

Until July 1, 1974, Smigel operated the apartment complex and paid all the expenses thereof, including the mortgage payments. During 1973, the only payment made by Aragon was the transfer of $215,000 from the Partnerships Inc. escrow account to Smigel and HPC. Furthermore, Aragon never made the monthly payments to HPC required under the articles of agreement.

On his 1973 return, petitioner claimed a deduction of $13,298 for his distributive share of the partnership loss.[9] In the notice of deficiency, respondent determined that petitioner had failed to show that Aragon sustained any deductible loss during 1973 and disallowed the claimed deduction.

### OPINION

We must decide whether petitioner is entitled to deduct his distributive share of the alleged partnership loss for 1973. The loss was attributable to the excess of the deductions claimed on Aragon's 1973 return in connection with the purchase and operation of the apartment complex over the rental income reported thereon. The availability of those deductions and the alleged partnership loss turns on whether HPC's sale of the apartment complex to Aragon was a sham. In resolving this issue, we must consider:

(1) Whether the articles of agreement transferred owner-

---

[9]In the notice of deficiency, respondent stated that petitioner had claimed a deduction of $13,344 for his distributive share of the partnership loss. Petitioner's return, however, shows that he only claimed a deduction of $13,298, attributable to his distributive share of the partnership ordinary loss and additional first-year depreciation.

ship, for tax purposes, of the apartment complex to Aragon in 1973; and

(2) Whether the labels that the prospectus and articles of agreement attached to the payments made by Aragon comport with economic reality.

Respondent contends that HPC's sale of the apartment complex to Aragon was a sham, contrived for the sole purpose of tax avoidance. According to respondent, Aragon did not acquire ownership, for tax purposes, of the apartment complex during 1973, but only an option to purchase the complex. It is respondent's position that Reilly manipulated the transaction in order to fabricate tax deductions which would further his syndication of Aragon. Respondent insists that the labels attached to the payments Aragon made to HPC were a sham and that petitioner has not established that any portion of those payments was deductible. Furthermore, respondent asserts that during 1973 Aragon did not have a depreciable interest in the apartment complex, incur any indebtedness which would allow an interest expense deduction under section 163,[10] or make any deductible expenditures with respect to the operation of the apartment complex. Accordingly, respondent maintains that Aragon did not sustain a deductible loss during 1973.

Petitioner, on the other hand, contends that Aragon became the owner, for tax purposes, of the apartment complex on July 1, 1973. Petitioner maintains that HPC's sale of the apartment complex was not a sham and that Aragon was entitled to the deductions claimed on its 1973 return. Therefore, petitioner insists that he is entitled to the claimed deduction for his distributive share of the partnership loss. For the reasons discussed below, we disagree with petitioner and hold for respondent.

Although a taxpayer is entitled to reduce the amount of his taxes by any means that the law allows, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). In *Higgins v. Smith*, 308

---

[10]All statutory references are to the Internal Revenue Code of 1954 as amended.

U.S. 473, 476–477 (1940), the Supreme Court further elaborated as follows:

> The Government urges that the principle underlying *Gregory v. Helvering* finds expression in the rule calling for a realistic approach to tax situations. As so broad and unchallenged a principle furnishes only a general direction, it is of little value in the solution of tax problems. If, on the other hand, the *Gregory* case is viewed as *a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability, it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration.* * * *
>
> * * * * * * *
>
> The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. * * *
>
> [Fn. refs. omitted. Emphasis added.]

It is now well established that the incidence of taxation depends upon the substance of the transaction and not the mere form, where the form is not imbued with economic reality. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). In order to assess the form and ascertain the substance of a transaction, we must determine (1) the purpose of the transaction, and (2) whether it affects the taxpayer's beneficial interest apart from the tax consequences. *Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Decon Corp. v. Commissioner*, 65 T.C. 829, 838 (1976).

Repeatedly, taxpayers have sought to obtain advantageous tax consequences through the manipulation of controlled entities. See, e.g., *Higgins v. Smith, supra*; *Griffiths v. Commissioner*, 308 U.S. 355 (1939); *Decon Corp. v. Commissioner, supra*; *Palmer v. Commissioner*, 44 T.C. 92 (1965), affd. per curiam 354 F.2d 974 (1st Cir. 1965). In the instant case, Reilly was the general partner of Aragon and owned all the capital stock of HPC. In addition, it is clear that Reilly organized Aragon to acquire the apartment complex and was the moving force behind the entire transaction. Since no evidence was offered to show that Reilly lacked complete control of either Aragon or HPC, we must conclude that such control existed. *Karme v. Commissioner*, 73 T.C. 1163, 1186 (1980), on appeal (9th Cir., May 5, 1980); *Decon Corp. v. Commissioner, supra* at 839; *Crown Cork International v. Commissioner*, 4 T.C. 19, 25 (1944), affd. 149 F.2d 968 (3d Cir. 1945).

Although "mere control alone" will not allow the form of a transaction to be disregarded, it indicates that the transaction was not made at arm's length. *Decon Corp. v. Commissioner*, *supra* at 839. See also *Sun Properties v. United States*, 220 F.2d 171 (5th Cir. 1955). Clearly, Reilly was effectively dealing with himself with respect to HPC's purported sale of the apartment complex to Aragon. He not only controlled both Aragon and HPC, but signed the articles of agreement on behalf of both entities. Such an absence of arm's-length dealing requires us to consider whether the form and substance of the transaction were the same. *Sun Properties v. Commissioner*, *supra* at 174; *Decon Corp. v. Commissioner*, *supra* at 839.

After a painstaking analysis of the multitude of documents and attendant circumstances in the instant case, we conclude that HPC, under Reilly's direction and control, was acting as Aragon's agent or nominee when it executed the installment contract. We hold that HPC's purchase and resale of the apartment complex to Aragon was a sham contrived by Reilly in order to create the appearance of a completed sale in 1973 and fabricate tax deductions, thereby furthering his promotion of Aragon as a tax shelter investment.

In determining whether the transaction involved herein was a sham, we first consider whether the articles of agreement transferred ownership, for tax purposes, of the apartment complex to Aragon in 1973. Under the articles of agreement, HPC agreed to deliver possession of the apartment complex to Aragon on the date the agreement was executed. From that date forward, HPC also agreed that Aragon would be entitled to the cash flow net operating income of the apartment complex. On July 1, 1973, the articles of agreement was executed. At that time, however, under the installment contract, HPC was not entitled to either possession of the apartment complex or the cash flow net operating income therefrom. Moreover, we believe that the sale under the installment contract was not completed until the final closing thereunder on July 1, 1974, and therefore, HPC could not have completed a sale of the apartment complex before that time.

For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under State law. *Yelencsics v. Commission-*

*er*, 74 T.C. 1513, 1527 (1980); *Clodfelter v. Commissioner*, 48 T.C. 694, 700 (1967), affd. 426 F.2d 1391 (9th Cir. 1970). The question of when a sale is complete for Federal tax purposes is essentially one of fact. The applicable test is a practical one which considers all the facts and circumstances, with no single factor controlling the outcome. *Baird v. Commissioner*, 68 T.C. 115, 124 (1977); *Deyoe v. Commissioner*, 66 T.C. 904, 910 (1976).

Generally, a sale of real property is complete upon the earlier of the transfer of legal title or the practical assumption of the benefits and burdens of ownership. *Baird v. Commissioner, supra* at 124. Where, as in the instant case, the transfer of legal title is delayed to secure payment of the purchase price, we must determine when the parties intended to transfer the benefits and burdens of ownership. *Deyoe v. Commissioner, supra* at 910; *Merrill v. Commissioner*, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964).

The installment contract provided for both a preliminary closing and a final closing. The preliminary closing was scheduled to occur within 60 days after the execution of the installment contract, and the final closing was to take place on the first anniversary of the preliminary closing or any earlier date chosen by HPC. The stated purchase price was $220,000 plus the unpaid balance of the principal and accrued interest on the underlying mortgage. HPC was required to pay $1,000 upon signing the installment contract and $99,000 at the preliminary closing. At the final closing, HPC was required to pay the balance of the purchase price by accepting title to the apartment complex subject to the mortgage and making a final payment of $120,000.

We find that under the installment contract substantially all the benefits and burdens of ownership remained with the seller[11] until the final closing. During the period of time

---

[11]Under the installment contract, the National Bank of Austin and Smigel, the trustee and beneficiary, respectively, of the Illinois land trust under which title to the apartment complex was held, were collectively referred to as the "seller." Under Illinois law, a land trust vests legal and equitable title with the trustee, and the beneficiary retains a personal property interest. *People v. Chicago Title & Trust Co.*, 75 Ill. 2d 479 (1979), 389 N.E.2d 540. Most of the attributes of ownership, however, are retained by the beneficiary under the trust agreement, and, in fact, "the only attribute of ownership ascribed to the trustee is that relating to title." *People v. Chicago Title & Trust Co.*, 389 N.E.2d at 543. Moreover, under Illinois law, actual ownership is deemed to lie with the beneficiary (*People v. Chicago Title & Trust Co., supra*), and the beneficiary alone can, in many instances, enter into a binding

between the preliminary and final closing, the seller not only retained legal title, but also remained in complete possession and control of the apartment complex. Smigel bore the entire burden of maintaining the apartment complex until the final closing, agreeing to, among other things, maintain the premises in as "good condition," excepting ordinary wear and tear, as of the date of the contract. During this period, the parties specifically agreed that the rental income would be the property of the seller and that the seller would pay all the expenses incurred in the operation of the apartment complex, including the mortgage payments. Smigel also agreed to protect HPC from any proceeding, action, or claim affecting the apartment complex or arising from the operation thereof. Furthermore, if any part of the apartment complex had been destroyed by fire or other casualty prior to the final closing, HPC had the right to rescind the installment contract and receive a refund of the purchase price.

In addition, pursuant to the undated rider to the installment contract, HPC agreed to pay the seller the difference between the face amount of the mortgage and the principal balance thereof on the date of the final closing. Thus, HPC would not receive any credit for the mortgage payments made prior to the final closing, and Smigel retained the benefit of the principal amortization attributable to those payments.

Until the final closing, the only burden assumed by HPC was the payment of $100,000, and the only real benefit HPC acquired was the right to purchase the apartment complex.

---

contract to sell the property held in trust. *Lampinen v. Hicks*, 73 Ill. App. 3d 376 (1979), 391 N.E.2d 1105. With respect to the legal significance of the Illinois land trust, the Supreme Court of Illinois stated:

"Indeed, there is not a single attribute of ownership, except title, which does not rest in the beneficiary. The rights of creation, modification, management, income and termination all belong to the beneficiary. In reality the transfer to the trustee is a formality involving a shifting of legal documents. The land trust is, in fact, a fiction which has become entrenched in the law of this State and accepted as a useful instrument in the handling of real estate transactions. Outside of relationships based on legal title, the trustees' title has little significance. * * * [*People v. Chicago Title & Trust Co.*, 389 N.E.2d at 545. Citations omitted.]"

Consequently, under Illinois law, Smigel possessed most of the attributes of ownership (i.e., the benefits and burdens of ownership) of the apartment complex prior to the execution of the installment contract. Therefore, for the remainder of this opinion, we shall consider Smigel the actual seller under the installment contract.

Although the installment contract also provided that on the date of the preliminary closing HPC would be entitled to all depreciation, payments of $1,000 per month for the seller's "use and occupancy" of the apartment complex until the final closing, and endorsements on all insurance policies, naming HPC as an additional insured, these rights were, at best, insignificant.

It is well settled that a deduction for depreciation is predicated upon an investment in property that would subject the taxpayer to an economic loss upon the property's deterioration through exhaustion, wear and tear, and obsolescence. *Baird v. Commissioner, supra* at 123; *Mayerson v. Commissioner*, 47 T.C. 340, 353 (1966). Thus, regardless of the terms of the installment contract, HPC would not be entitled to deduct any depreciation on the apartment complex until it had acquired an investment therein. We are convinced that no such investment could be acquired until the final closing. Before that time, HPC did not acquire an economic interest in the apartment complex, but only the right to acquire such an interest upon the completion of the sale.

HPC's right to be named as an additional insured on all insurance policies covering the apartment complex has little practical significance. Upon the destruction of any part of the premises by casualty, HPC had the option to rescind the installment contract and receive a refund of any money previously paid. If, however, HPC chose not to exercise that option, the seller was not required to assign its right to any insurance proceeds to HPC until the final closing.

Finally, while the installment contract appears to effect a net lease with the $1,000 monthly payments constituting rent, this characterization fails to comport with economic reality. First, no evidence has been offered to show that the purported rent payable under the installment contract even approaches the fair rental value of the apartment complex. Second, petitioner has failed to prove that Smigel ever made the monthly payments either to HPC or Aragon. Third, the professed net lease is part of the installment contract and is inseparable therefrom. The extensive rights and duties that Smigel retained under the installment contract are simply incompatible with characterizing his operation of the apartment complex as a net lease. See *Estate of Franklin v.*

*Commissioner*, 64 T.C. 752, 769 n. 15 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

Relying on the purported letter of clarification from HPC to Smigel, dated October 24, 1973, petitioner insists that the installment contract, as so clarified, shifted the benefits and burdens of ownership to HPC on July 1, 1973. The letter of clarification stated that Smigel was retaining title solely as security and was managing the apartment complex, collecting the rents, and paying the expenses of the operation on HPC's behalf and for its benefit as owner. According to that letter, the excess of the net cash income from the operation over the $1,000 per month payable to HPC constituted Smigel's compensation for managing the apartment complex.

We cannot accept the significance which petitioner accords the purported letter of clarification. While both the installment contract and the letter of clarification stated that title was being retained solely as security, that statement is inconsistent with the substance of the transaction. Moreover, the letter does not ostensibly claim to modify the rights of the parties under the installment contract, but rather simply professes to appropriately depict the existing rights and duties of the parties.[12] To the extent that the letter did represent a modification of the terms of the installment contract, the fact remains that Smigel retained the benefits and burdens of ownership until the final closing. There is no evidence which indicates that the alleged compensation Smigel received for managing the property was reasonable. It is clear, however, that by way of this so-called compensation Smigel, in fact, retained the benefits of ownership.

Although the parties undoubtedly contemplated the eventual completion of the sale, "the intent to sell is not synonymous with a sale." *Penn-Dixie Steel Corp. v. Commissioner*, 69 T.C. 837, 845 (1978). On the basis of the entire record herein we

---

[12]While petitioner relies heavily on the purported letter of clarification, he concludes that the installment contract, as so clarified, effected a lease of the apartment complex to Smigel for $1,000 per month with Smigel paying all the expenses of operating the apartment complex on behalf of HPC, as owner. This conclusion, however, is inconsistent with characterization set forth in the letter of clarification. Rather, it parallels the terms of the installment contract and indicates to us that the letter did not modify the rights and duties of the parties under the installment contract. Furthermore, we believe it underscores the difficulty inherent in any attempt to characterize Smigel as operating the apartment complex in any capacity other than as owner.

hold that the parties to the installment contract did not intend to transfer the accoutrements of ownership until the final closing.[13] See *Commissioner v. Stuart*, 300 F.2d 872 (3d Cir. 1962), revg. a Memorandum Opinion of this Court; *Baird v. Commissioner, supra* at 128; *Pacific Coast Music Jobbers, Inc. v. Commissioner*, 55 T.C. 866, 877 (1971), affd. 457 F.2d 1165 (5th Cir. 1972). We are convinced that Smigel retained ownership of the apartment complex until the completion of the sale at the final closing.[14] Cf. *Handelman v. Commissioner*, 509 F.2d 1067 (2d Cir. 1975), revg. a Memorandum Opinion of this Court; *Mittleman v. Commissioner*, 56 T.C. 171 (1971), affd. per curiam 464 F.2d 1393 (3d Cir. 1972); *Lowe v. Commissioner*, 44 T.C. 363 (1965); *Boatman v. Commissioner*, 32 T.C. 1188 (1959).

Accordingly, since the final closing was not consummated until July 1, 1974, the articles of agreement could not have transferred ownership, for tax purposes, of the apartment complex to Aragon in 1973. Consequently, Aragon did not acquire an economic interest in the apartment complex during 1973 and, therefore, is not entitled to any depreciation deduction for that year. Furthermore, since the operating expenses of the apartment complex throughout 1973 were paid by the actual owner, Smigel, Aragon was not entitled to claim any deduction therefor.

We next consider whether the labels that the prospectus and articles of agreement attached to the payments made by Aragon comport with economic reality. Initially, from an inspection of the articles of agreement we are unable to ascertain any rhyme or reason to the breakdown of the purchase price set forth therein. Although the stated purchase

---

[13]On brief, petitioner argued that the following cases supported a finding that the accoutrements of ownership were transferred on July 1, 1973: *Clodfelter v. Commissioner*, 426 F.2d 1391 (9th Cir. 1970), affg. 48 T.C. 694 (1967); *Commissioner v. Baertschi*, 412 F.2d 494 (6th Cir. 1969), revg. 49 T.C. 289 (1967); *Deyoe v. Commissioner*, 66 T.C. 904 (1976). We, however, have carefully considered each of these cases and have found them readily distinguishable from the instant case.

[14]Having reached this conclusion, we deem it unnecessary to further decide whether the installment contract constituted only an option to purchase the apartment complex as argued by respondent. See *United States Freight Co. v. United States*, 190 Ct. Cl. 725, 422 F.2d 887 (1970); *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

price is $1,650,000, the total of the amounts described as payments of principal is only $1,537,250.[15] In addition, it is impossible to determine the source of validity of the $1,472,000 indebtedness assumed by Aragon therein. Moreover, the $192,000 which Aragon agreed to pay as interest on this sum for the balance of 1973 and 1974 could not be attributable to an interest rate of only 3.5 percent.[16]

While the prospectus also stated that the total purchase price was $1,650,000, it provided that the purchase price would be paid in the following manner: (1) Aragon would receive a credit of $1,280,000 for the mortgage; and (2) would pay the balance of the purchase price, $370,000, in two installments— $215,000 at closing in 1973 and $155,000 on July 1, 1974. After setting forth the essential parameters of the transaction, the prospectus allocated the $370,000, which would be raised from the sale of partnership units and eventually paid to HPC and Smigel, among the following items:

|  | At closing | 1974 (1 year later) |
| --- | --- | --- |
| Purchase price | $2,250 | $63,000 |
| Management fees | 52,750 | 28,000 |
| Contract financing points | 32,000 | --- |
| Prepaid interest | 128,000 | 64,000 |
|  | 215,000 | 155,000 |

According to the prospectus, the management fees, contract financing points, and prepaid interest would be fully deductible in the year paid.

Although the prospectus indicated that the prepaid interest payable in 1973 was for interest which would accrue in 1973 and 1974, and that the prepaid interest payable in 1974 was for interest which would accrue in 1975,[17] neither the interest rate nor the principal sum that was used to calculate the

---

[15]Interestingly, the statement of financial position prepared by Aragon's accountants stated that Aragon had fixed assets before depreciation of $1,537,250. In addition, on Schedule L of its 1973 return, Aragon claimed this same amount of fixed assets.

[16]At an interest rate of 3.5 percent per annum (simple interest), the maximum amount of interest which would accrue on the sum of $1,472,000 for a period of 1½ years is $77,280.

[17]The articles of agreement, on the other hand, provided that the entire $192,000 (128,000 + 64,000) of prepaid interest was payable for interest accruing in 1973 and 1974. This inconsistency is particularly astounding considering the fact that a copy of the articles of agreement was attached to the prospectus.

amount of interest which would accrue for those periods was stated. The prospectus provided that the prepaid interest would be added to the "contract balance" due to HPC. While noting that the contract balance would be greater than the balance due on the mortgage because of the addition of prepaid interest, the prospectus stated that a lower interest rate would be charged in the "purchase contract" so that the monthly cash payments due under the mortgage and purchase contract would be the same. Thus, the $1,472,000 indebtedness set forth in the articles of agreement must have been determined by adding the balance due under the mortgage ($1,280,000) and the total prepaid interest ($192,000).

Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." For Federal income tax purposes, "interest on indebtedness" is generally defined as "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498 (1940). In determining whether a payment constitutes interest on indebtedness, economic realities, not form, control the determination. *Knetsch v. United States*, 364 U.S. 361, 366 (1960); *Titcher v. Commissioner*, 57 T.C. 315, 322 (1971). Amounts denominated as interest cannot be deducted where the underlying transaction was a sham. See *Collins v. Commissioner*, 54 T.C. 1656, 1664 (1970).

In reality, the transaction herein under consideration did not create a genuine indebtedness, and therefore, Aragon was not entitled to any interest expense deduction for 1973. Significantly, the prospectus discloses that the purported $1,472,000 indebtedness was determined by adding the total prepaid interest ($192,000) to the balance due under the mortgage on the apartment complex. Nevertheless, the articles of agreement stated that the same $192,000 represented interest on said indebtedness. Furthermore, the prospectus reveals that the interest rate charged under the articles of agreement was manipulated to provide monthly payments equaling those required under the mortgage. Moreover, we have found as a fact that Aragon did not make the monthly payments to HPC, and we believe that there never was any intention that these payments would be made.

Clearly, this contrivance did not establish a genuine indebtedness. HPC did not forbear the collection of any money, and

Aragon did not obtain the use of any of HPC's funds. The indebtedness established under the articles of agreement was a facade used to support the claimed interest deductions. When Aragon became the owner of the apartment complex, the only indebtedness was based on the underlying mortgage. While the prospectus stated that HPC would accept the prepaid interest as ordinary income, we consider that fact irrelevant since it was simply an element of the facade "to clothe the payment with the garb of interest," *Collins v. Commissioner, supra* at 1665.

Moreover, we believe that all of the labels attached to the $370,000 paid by Aragon to HPC and Smigel lacked economic reality. Compare *LaCroix v. Commissioner*, 61 T.C. 471 (1974); *Titcher v. Commissioner, supra*; *Collins v. Commissioner, supra*. Each label was a component in Reilly's plan to promote Aragon as a tax shelter investment. Petitioner has not shown that Aragon was entitled to any deduction for the claimed contract financing points. While the prospectus stated that HPC would be paid $32,000 "for its services relating to the first mortgage financing," the record contains nothing that even suggests HPC performed such services.[18] Moreover, since the mortgage financing was acquired by Smigel and the National Bank of Austin in 1972, it is unlikely that HPC performed any services in connection with the acquisition of this financing.

While the prospectus stated that Reilly would be paid $52,750 in 1973 and $28,000 in 1974 for "general supervision" of both Aragon and the day-to-day operation of the apartment complex, no evidence has been offered to show either the nature or degree of the supervision Reilly provided to Aragon. In fact, aside from the prospectus, there is no other evidence that supports the denomination of these amounts as management fees. Significantly, the findings of fact show that the amounts purportedly payable to Reilly as management fees were actually paid to HPC. In addition, we have found that Aragon was not the owner of the apartment complex during

---

[18]Even if HPC had performed such services, Aragon would not have been entitled to deduct the full amount of the payments for those services in the year paid. Payments for services in connection with the acquisition of a loan are capital expenditures which must be amortized over the life of the loan. *Wilkerson v. Commissioner*, 70 T.C. 240, 253–257, 261–262 (1978), on appeal (9th Cir., Oct. 1, 1979); *Lay v. Commissioner*, 69 T.C. 421, 437–440 (1977).

1973, and that Smigel, not Reilly, was in complete control of its day-to-day operation during that year. Under these circumstances, we cannot accept the characterization of these amounts as management fees.

On the basis of the foregoing, we conclude that the articles of agreement was simply part of a sham manufactured by Reilly to enhance his promotion of Aragon as a tax shelter investment. On numerous occasions taxpayers have engaged in complex artifices solely to lay the foundation for tax deductions, and in all instances judicial scrutiny has struck down these devices. See, e.g., *Knetsch v. United States, supra*; *Barnett v. Commissioner*, 44 T.C. 261 (1965), affd. 364 F.2d 742 (2d Cir. 1966); *Lynch v. Commissioner*, 31 T.C. 990 (1959), affd. 273 F.2d 867 (2d Cir. 1959); *Goodstein v. Commissioner*, 30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959). In the instant case, Reilly has used HPC as the principal component of a facade created to support the promises contained in the prospectus. In the prospectus, Reilly promised that an investment in Aragon would reap substantial tax benefits in 1973. By means of his control of HPC, Reilly fabricated a transaction that both purported to complete the sale of the apartment complex in 1973 and establish tax deductions, thereby lending form to the promises contained in the prospectus.

From the outset, Reilly contemplated Aragon's eventual acquisition of the apartment complex. Nevertheless, Reilly also sought to promote Aragon as a tax shelter investment, and he used HPC as the vehicle to attain this goal. No legitimate business purpose was served through HPC's participation in the acquisition of the apartment complex. It was never intended that HPC would actually own or operate the apartment complex, and in fact, upon the final closing under the installment contract, the apartment complex was deeded to the trustee under a trust agreement that named Aragon as the beneficiary. Thus, HPC's purchase and resale of the apartment complex was a sham. Neither the effort to complete the sale of the apartment complex to Aragon in 1973 nor the labels fastened to $370,000 paid by Aragon to HPC and Smigel had any substance.

The mere fact that tax planning is considered in structuring a transaction does not require us to ignore the transaction for tax purposes. Nevertheless, the above-described transaction

did not affect petitioner's beneficial interest other than to reduce his taxes and, therefore, must be ignored for tax purposes. *Knetsch v. United States, supra* at 366. We are convinced that HPC, under Reilly's direction and control, was merely acting as Aragon's agent or nominee when it executed the installment contract.[19] See *Red Carpet Car Wash, Inc. v. Commissioner*, 73 T.C. 676, 685–686 (1980); *Louis Adler Realty Co. v. Commissioner*, 6 T.C. 778, 786 (1946). We hold that Aragon, not HPC, was the real purchaser under the installment contract and made the payments required thereunder as purchaser, with HPC simply serving as a conduit. Compare *Commissioner v. Court Holding Co., supra*; *Griffiths v. Commissioner*, 308 U.S. 355 (1939); *Hindes v. United States*, 326 F.2d 150 (5th Cir. 1964).

Aside from the payments under the installment contract, which total $220,000, Aragon paid HPC a total of $150,000 which HPC retained. Petitioner, upon whom rests the burden of proof, has failed to establish that any portion of this amount represents a deductible expenditure. See *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. On the record before us, we are unable to ascertain the purpose underlying the payment of $150,000 to HPC. It is possible that this payment represented a fee for the facade which HPC provided. See *Knetsch v. United States, supra* at 366. We, however, believe that the $150,000 constitutes payment for services performed by Reilly and HPC in connection with organization and syndication of Aragon and the acquisition of the apartment complex. See *Estate of Boyd v.*

---

[19]We recognize the fact that ordinarily a corporation must be respected as a separate entity for tax purposes. *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934). Generally, if a corporation was created or functions for some business purpose, its separate existence may not be disregarded and its income may not be attributed to its shareholders either on the ground that it was merely a sham or on the ground that it was the agent of its shareholders. *Moline Properties, Inc. v. Commissioner, supra*; *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949); *Harrison Property Management Co. v. United States*, 201 Ct. Cl. 77, 475 F.2d 623 (1973), cert. denied 414 U.S. 1130 (1974). In the instant case, however, the issue is *not* whether HPC must be recognized as a separate taxable entity, but rather who was the actual purchaser under the installment contract. Cf. *Red Carpet Car Wash, Inc. v. Commissioner*, 73 T.C. 676, 685–686 (1980). We are not deciding who is taxable on the payments Aragon made to HPC.

*Commissioner*, 76 T.C. 646 (1981). Such expenditures are nondeductible capital expenses.[20] *Hilton v. Commissioner*, 74 T.C. 305, 366 (1980); *Kimmelman v. Commissioner*, 72 T.C. 294, 304 (1979); *Cagle v. Commissioner*, 63 T.C. 86, 96–97 (1974), affd. 539 F.2d 409 (5th Cir. 1976).

In reaching our decision in this case, we are not questioning petitioner's good faith. We are unaware of any evidence indicating petitioner recognized or understood the dubious character of the tax consequences set forth in the prospectus at the time he made his investment in Aragon. Nevertheless, unless the statute itself turns on intent, the incidence of taxation depends upon "objective realities" and not the subjective good faith of the individual taxpayer. *Lynch v. Commissioner*, 273 F.2d 867, 872 (2d Cir. 1959), affg. 31 T.C. 990 (1959). See also *Karme v. Commissioner*, 73 T.C. 1163, 1194 (1980), on appeal (9th Cir., May 5, 1980).

Accordingly, since petitioner has failed to prove that Aragon incurred any deductible loss for 1973, we sustain respondent's determination.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[20]Sec. 709(a) expressly provides that organization and syndication expenses are not deductible, except as provided in sec. 709(b). Sec. 709(b) allows a partnership to elect to amortize organizational expenses over a period of not less than 60 months. Sec. 709(b) applies only to organizational expenses paid or incurred in taxable years beginning after Dec. 31, 1976. Sec. 213(f)(3), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1549, 1976–3 C.B. (Vol. 1) 24–25.